**RANSBURG ELECTRO–COATING CORPORATION, a corporation, Plaintiff,**

v.

**PROCTOR ELECTRIC COMPANY, Inc.,** a corporation, and

**Ionic Electrostatic Corporation, a corporation, Defendants.**

**Civ. A. No. 10181.**

United States District Court
D. Maryland.

March 15, 1962.

G. C. A. Anderson, Anderson, Barnes & Coe, Baltimore, Md., James P. Hume, Howard W. Clement, Byron, Hume, Goen & Clement, Chicago, Ill., for plaintiff.

Everett L. Buckmaster, Buckmaster, White, Mindel & Clarke, Baltimore, Md.; Stanton T. Lawrence, Jr., W. Brown Morton, Raymond B. Canfield, Pennie, Edmonds, Morton, Barrows & Taylor, New York City; Herbert J. Smith, Garfield, N. J., of counsel, for defendants.

R. DORSEY WATKINS, District Judge.

This case involves claims by plaintiff for infringement of patents relating to electrostatic spray-coating systems, and counterclaims by defendants for declarations that said patents are invalid, and are not infringed. The actual devices developed by plaintiff and defendants are used solely in the field of electrostatic painting, and except with respect to a discussion of the prior art, only that field need be considered.

### Background—Parties.

Plaintiff Ransburg Electro-Coating Corporation (plaintiff, or Ransburg) is an Indiana corporation organized on January 1, 1948, with its principal office and place of business in Indianapolis, Indiana. It was preceded in business by a partnership of Harper J. Ransburg and his sons Harold, Gregg and Edwin. Plaintiff owns the patents in suit, relating to methods and apparatus for electrostatic spray painting.

Defendant Proctor Electric Company, Inc. (Proctor) is a Pennsylvania corporation with a regular place of business in Baltimore, Maryland. It is a purchaser and user of certain alleged infringing devices, its acts having occurred in the District of Maryland.

Defendant Ionic Electrostatic Corporation (Ionic) is a New Jersey corporation. It was organized in May 1957 by John Sedlacsik, Sr., and his son, John Sedlacsik, Jr., doing business in the manufacture and sale of various types of electrical equipment. Ionic markets airless electrostatic spray-coating equipment. It has no place of business within the District of Maryland, but voluntarily entered its appearance, answered the

original complaint, and has conducted the defense for both defendants.

### Background—Painting.

In addition to the use of the familiar paint brush, many articles have for a number of years been, and are being, satisfactorily painted by dipping, roller coating, flow coating, and spraying. We are concerned only with the problems associated with spray-coating.

For many years, painting has been done with compressed air spray guns. Paint is brought to a head or nozzle and subjected to compressed air which "atomizes"[1] the paint and projects or propels the atomized particles for deposition upon the articles to be painted. A skilled operator can closely control the size of the particles, and produce an excellent finished product. However, some of the particles fall short of the mark; and as the air must escape, a substantial volume of paint is carried away as "overspray" from, and misses, the target. Moreover, where the article to be coated is not solid and flat, the method is still less efficient. Health and safety considerations require the use of spray-booths, exhaust systems, and often, paint-recovery apparatus.

Paint losses in the use of compressed air spray guns may amount to sixty per cent, more or less, of the paint sprayed.

The Ransburg partnership had developed, and since 1944 had been marketing,[2] a patented improvement on the old compressed-air spray-gun method. This process was and is generally referred to as the "No. 1 Process." A conventional compressed air spray gun was used, but after atomization the atomized particles were directed toward and exposed to an electrostatic field maintained between a fine wire electrode and the articles to be painted, which were maintained at ground potential. To the extent that such particles received an electrical charge, they would be "urged" by electrostatic forces toward deposition on the work. The system represented a decided improvement over the compressed air gun, and effected a saving of about fifty per cent of the paint previously lost. However, not all the particles "atomized" received a charge, or a sufficient charge, to guide them to the work; and in some instances the force imparted in atomization, or by the current of air, was sufficient to result in overspray. Equipment such as spray-booths, exhaust systems, and paint recovery apparatus were still necessary.

Thought was given to methods of controlling or eliminating the current of air. The impetus toward the methods and apparatus in suit was adventitious. An exhibit of the No. 1 System was being prepared, consisting of a platform on which was mounted the electrostatic spray grid, the spray gun, a spray booth, and the high voltage supply to the grid. An employee of the Ransburg partnership was standing on the platform, ironically enough preparing to put the finishing touches on the booth with a conventional paint brush, when he noticed that the paint was leaving the bristles in a fine spray, and was being deposited on an opposed grounded metal surface. This was reported to the partnership, and an analysis disclosed that the painter was standing on a wooden platform, holding the brush near the charged grid, and the paint on the brush had been subjected to the field between the grid and the grounded metal. This suggested an airless atomization and deposition, and led to further work resulting in the patents in suit.[3]

### The Patents in Suit.

In the original complaint, infringement of four patents was alleged. There-

---

1. The word "atomize" is customarily used to describe the fragmented particles of paint created by the flow of air.

2. The system was licensed to several hundred users. Many of the licenses are still in effect.

3. Some of the drawings in the first two patents reflect the effort to reproduce this situation, substituting for the bristles, spaced apertures with means for replenishing the paint as used.

after, leave was granted to file a supplemental complaint charging defendants with infringement of two newly issued patents, and substituting a reissue patent for an originally issued one. Defendants counterclaimed for declarations of invalidity and noninfringement as to all these patents. Plaintiff withdrew charges of infringement of Patent No. 2,658,472, and stated for the record in open court that no suits on this patent would be brought, or threats of suit be made against the defendants or any claiming through or under them with respect to any apparatus then in use by either defendant. There is no evidence, or proffer with respect thereto, as to the validity vel non of Patent No. 2,658,-472, and no declaration with respect to validity will be entered in this case.[4]

The patents presently in suit, all owned by plaintiff, are:

| Patent No. | Patentee | Issued |
|---|---|---|
| 2,685,536 | W. A. Starkey and E. M. Ransburg | Aug. 3, 1954 |
| 2,794,417 | W. A. Starkey and E. M. Ransburg | June 4, 1957 |
| 2,893,893 | W. W. Crouse | July 7, 1959 |
| 2,893,894 | E. M. Ransburg | July 7, 1959 |
| Re.24,602 | C. C. Simmons (a reissue of original patent 2,808,-343, issued Oct. 1, 1957). | Feb. 17, 1959 |

Of these, the following claims are:

| Patent No. | Claims Allegedly Infringed | Typical Claims |
|---|---|---|
| 2,685,536 | 1 – 11 | 4, 10 |
| 2,794,417 | 3 – 4 | 3, 4 |
| 2,893,893 | 1, 2, 3, 5, 6, 8 – 10 | 2, 9 |
| 2,893,894 | 1 – 8 | 1, 7 |
| Re.24,602 | 1, 6 – 10, 12, 13, 15 – 21 | 8, 13, 15, 20 |

For reading convenience, the "typical claims" are printed as Appendix A.

Plaintiff claims that the patents in suit disclose methods and apparatus in which, for the first time, in an airless electrostatic field, the paint is made the electrode and electrostatically atomized, or that at least the paint is charged and atomized at the point of highest field intensity, is at the moment of atomization given a "built-in" charge, and that the electrostatic field thereupon disperses the particles, and deposits them upon the work.

The methods claimed by plaintiff have been highly successful commercially. Substantially one-hundred per cent of paint used is deposited upon the work. Over 500 licenses exist, from which plaintiff derives $2,000,000 to $3,000,000 annually in royalties.

Defendants have introduced the usual defenses of invalidity and noninfringement. As is to be expected of competent counsel (and not to be discounted because of lack of "novelty"), these have encompassed the aspects of anticipation, lack of novelty, misuse of patent monop-

4. The court is willing to incorporate in the decree a finding that plaintiff is estopped from asserting against defendants or their privies any claim that any device of defendants in existence at the conclusion of the trial infringes said patent.

oly, lack of adequate disclosure, indefiniteness and excessive breadth of claims and double patenting. As to the scope of the patents, if valid, and on the question of infringement, defendants raise the issue of file wrapper estoppel. With respect to scope of the patents, and infringement, defendants contend that the patents, if valid, are limited to those applications in which electrostatic forces are the *sole* source of atomization, dispersion and deposition. Otherwise stated, defendants claim that no infringement occurs if, specifically, centrifugal force plays *any* part, no matter how small, in either and/or atomization, dispersion or deposition. These contentions make it more than usually difficult to departmentalize the treatments of validity and infringement.

During the trial of the case, and at its conclusion, the court of record stated to counsel the principal problems the court believed to be involved, and an adequate opportunity was given counsel to brief these and any other questions, and thereafter some two days of oral argument were allowed. As a result, some narrowing of the issues resulted. The defense of misuse of the patent monopoly was not formally abandoned, but was not pressed, and the court finds that there is no legally sufficient evidence to support this defense. The claim of anticipation by public use has been reduced from three alleged instances to one.[5]

All reliance by defendants on prior publications has been abandoned.

Of the prior art references as to anticipation and/or lack of novelty, cited by defendants in advance of trial, one of their alleged experts testified as to the supposed significance and effect of 35.[6] Only seven were seriously pressed in defendants' final brief and argument.

### General Description of Nature of Patents in Suit.

Patent 2,685,536 (Starkey '536) represents the method aspects of the first development of the airless electrostatic painting, which in its entirety has frequently been described as the No. 2 Process. All claims are in suit, claims 4 and 10 having been selected by plaintiff as typical.

The method is based upon the alleged discovery that with an electrostatic field established between a grounded object to be painted, and unatomized paint, and if the field were of appropriate strength [7], and the paint were presented in a sufficiently thin condition, the field would, without the aid of air blast, centrifugal, hydraulic or other mechanical force, atomize the paint into particles, electrically charge such particles simultaneously or coincidentally with their formation, disperse them and deposit them on the object to be coated, the deposition being in accordance with the lines of force established between the paint at the points of atomization and the work.

Starkey '536 discloses several specific forms for an atomizing head by which unatomized paint may be presented to the field. In each of the examples the head presents toward the article to be painted an extended straight edge to which the paint is fed at a controlled rate, and along which edge the paint is presented in the form of separated, supported droplets, the spacing of said droplets being determined by the mechanical structural features of the head.

---

5. The court does not criticize defendants' counsel for initially raising these three alleged instances. In view of the complete failure of the evidence with respect to two of them, the court would have been highly, and vocally, critical, if they had further been pressed.

6. It is, perhaps, only fair to state that in the prosecution of the five patents in suit the Patent Office cited, as to

| | |
|---|---|
| '536 Patent | 19 references |
| '417 Patent | 5 references |
| '893 Patent | 16 references |
| '894 Patent | 13 references |
| '602 Reissue Patent | 15 references |

7. Ordinarily of the nature of 90,000 volts, direct current.

In each of the examples or forms specifically illustrated, the head is stationary; and as no air blast, centrifugal or hydraulic forces are shown or suggested, the atomization therefrom must, if it occurs (and it does[8]) have been solely electrostatically effected. However, the claims of Starkey '536 are not in terms limited to an electrostatic painting method in which the atomizing head is stationary, or presents the paint to the electrostatic field only in a straight line; or where the electrostatic field is the sole agent affecting or contributing to atomization, dispersion and deposition; although in Claim 10 there must be "an electrostatic field of sufficient strength that it both electrostatically atomizes small particles of coating material from such exposed termini and electrostatically deposits them * * *"

The method claims in Starkey '536 do eliminate the use of a high-velocity air blast for atomizing and depositing paint particles. Starkey '536 also discloses the paint as the charging electrode; or at least the presenting of the paint for atomization at the point of highest field intensity, where it is effectively charged sufficiently to cause its dispersal and deposition by the existing electrostatic field and forces.

Starkey '417 discloses and claims apparatus aspects of Starkey '536. It resulted from a voluntary division of the application maturing into Starkey '536, and has the same disclosures and drawings as Starkey '536. Claims 3 and 4 are in suit. They are directed to heads in which droplets are formed, either completely separated, or bridging the spaces at their bases. The claims are not, in terms, limited to apparatus in which the head is stationary, or to any specific structural mechanical feature with reference to the places where atomization occurs; nor is the electrostatic field claimed as the sole source and cause of atomization, dispersion and deposition, although the electrostatic field must be "capable of" atomization, dispersion and deposition.

Crouse '893 resulted from the discovery that electrostatic atomization could be effected without the initial separation, by mechanical means, of the fed paint into discrete droplets. Again, the specific heads shown are stationary. In each, the liquid is fed through an arcuate, annular, or straight line slot or opening to form it into a film of uniform thickness when presented to the electrostatic field. In all except one illustration of arcuate structures, a plug is inserted.

When the paint is subjected to the electrostatic field, the field forms or deforms the edge of the film into a series of spaced projections or streamers, frequently referred to as "cusps," the charged ends of which are broken off by the fied, dispersed as a spray and deposited on the work. The spacing of the points of atomization is uniformly effected by the field, without the need of structural separation. The spacing is a function of the quantity of paint presented to the field, and the strength of the field. Much closer spacing of the points of atomization is possible than through mechanical spacing of droplets, and hence a greater amount of painting can be done in the same time.

While in Crouse '893 paint is fed under pressure to a chamber, all the devices shown rely upon a gravity flow; except in one instance, all the devices shown are designed to be operated with the work immediately below them. In the single exception illustrated, the work is

8. The court, at the request of counsel, spent more than three days out of the court room, examining physical demonstrations of all plaintiff's devices (or replicas thereof), of the accused devices, and of some of the alleged prior art. Reporters were present during the demonstrations, and a record was made of any statements, explanations and questions of counsel. In addition, in several instances after the completion of particular demonstrations, the court dictated into the record, in the presence of counsel, and with full opportunity to counsel to object or attempt to correct, a summary of the court's observations.

placed immediately above an inverted container or head.

In practice, the annular form of apparatus is preferred. The field strength is substantially identical at all locations, as distinguished from the concentration of field strength which occurs at the ends of a straight-edged head. One apparent disadvantage of the use of the circular head is that it tends to cause the deposit of paint in a doughnut[9] shaped pattern.

Claims 1–3, 5, 6 and 8–10 of Crouse '893 are asserted against all the accused structures, claims 2 and 9 being asserted as typical. Although all illustrations show stationary heads, the claims are not in terms so limited; nor are they limited to cases in which the film presented to the electrostatic field is formed by passing it through an elongated slot. Again, while the asserted claims are not in terms limited to heads in which the electrostatic field is the sole atomizing agency, the claims do call for the maintenance between the film edge and the article to be painted of a field "of sufficient strength" to draw the film into cusps and electrostatically to atomize particles from the edge of the film or from the cusps, and disperse and deposit them.

Ransburg '894 states that it is an improvement upon Crouse '893. It sought to produce greater uniformity in the pattern of the spray, and to overcome the gravitational limitations of stationary heads, by "rotating the film-supporting atomizer about the film axis." The specific embodiment described relates to an annular film, but other forms of atomizers are specifically not disclosed.

All the claims in Ransburg '894 are asserted against the accused devices. Claims 1 and 7 are asserted to be typical. Other than that the heads must be rotatable, the claims are not in terms limited to any particular form of head.

Again, while the claims are not in terms limited to heads in which the electrostatic field is the sole atomizing agency, the claims do call for the maintenance between the film edge and the article to be coated of an electrostatic field "of sufficient strength" to draw the film into cusps and to electrostatically atomize particles from the cusps, and disperse and deposit them.

In the specifications it is stated[10] that with a cylindrical head three inches in diameter, operated eight inches from the surface to be coated, synthetic enamel was successfully applied, 75,000 volts being used to produce the atomization and precipitation of the material, while the head was being rotated at approximately 150 r. p. m.

Further, on speeds of rotation, and the relative effects of centrifugal force and field strength on degree of atomization and shape of spray, the specifications recite.[11]

"The speed at which my atomizer is rotated in order to obtain the benefits of the invention will depend upon several factors. If the atomizer axis is vertical with the cusp-tips lying in a horizontal plane, and rotation is employed solely to effect uniformity of distribution, the atomizer may rotate slowly, say at a speed of a few dozen turns per minute. If the atomizer-axis is not vertical and rotation is relied upon to counteract the force of gravity, higher rotational speeds will be employed; but even with the atomizer-axis horizontal and a liquid of relatively low viscosity being atomized, the tendency of the liquid to collect at and near the low point of the atomizer edge can be effectively counteracted by rotating the atomizer at a speed which will subject the liquid to a centrifugal force equal at most to several times the force of gravity. It may be convenient

---

9. Mid-Western nomenclature, used throughout the trial of the case. My own Baltimore, Maryland heritage would refer to the shape as that of a cruller.

10. Column 5, lines 35–44.

11. Column 6, line 64—Column 7, line 42.

in some cases to employ speeds higher than necessary, as where higher speeds would simplify or lessen the cost of the atomizer-rotating means.

"Experiments establish that such centrifugal force as is imposed on the liquid by my rotating atomizer has far less effect than field-strength on either the degree of atomization or on the shape of the liquid spray, and that if the field has the preferred strength—i. e. an average potential-gradient of the order of 10,000 volts per inch—the speed of atomizer-rotation has no significant effect. For example, if an atomizer like that of Fig. 5 having an annular edge two inches in diameter, is positioned opposite an extended flat plate and an electrostatic field having an average gradient of 10,000 volts per inch is created between atomizer and plate, the fineness of atomization and the shape of the spray are substantially the same at 5,000 r. p. m. as they are at 200 r. p. m. But, if under the same conditions, the atomizer is rotated at a constant speed—say 1,000 r. p. m.—and the field strength is gradually reduced by lowering the potential-difference maintained between atomizer and plate, the spray begins to spread and atomization becomes much coarser, which coarser atomization can be prevented by maintaining an adequate potential gradient at the leading edge, irrespective of the polarity thereof.

"I am aware that it has heretofore been proposed in United States Letters Patent No. 1,861,495, granted June 7, 1932, to atomize a liquid by feeding it to a rotating element driven at such a speed that the liquid is broken up into drops as it is thrown from the element by the action of centrifugal force. It is my experience, however, that in such atomizers, even when they are rotated at speeds sufficient to subject the liquid to centrifugal forces many hundred times that of gravity, the atomization is very materially coarser than that which can be produced electrostatically with a field having a potential gradient in the neighborhood of 10,000 volts per inch."

The only claim in which any reference is made to speed of head rotation is Claim 6, which claims the method of Claim 1, "further characterized in that the speed of head rotation is insufficient in itself to produce comparable atomization." [12]

Reference has been made to the hollow center of the spray produced by annular heads embodying the teachings of Crouse '893 and Ransburg '894. In the coating of extended surfaces, this caused a variation in coating thickness transversely of the direction of surface movement through the spray. A successful expedient to overcome this defect and to produce a satisfactorily uniform coating was to combine the use of several annular spray heads (usually three; a larger inner one, and two smaller outer ones, diagonally disposed toward each other) so that an overlapping would produce a composite coating of substantially uniform thickness. Defendant Proctor is using such a "three-bell" system under license from plaintiff Ransburg.[13]

Simmons, Re. 24,602 seeks to make a virtue of the annular hollow spray pattern of Ransburg '894. The specific systems of Re. 24,602 employ rotating atomizing heads, each arranged on a vertical axis. The articles to be painted are moved in a path around the axis of the spray, and the projection of the spray is generally radial. When the vertical dimension of the article to be coated is large enough to require it, the atomizing head may be reciprocated vertically. The paths of the articles within the spray are shown as essentially cir-

12. Column 8, lines 22–24. Further discussion of this aspect is postponed to the consideration of the question of infringement.

13. No objection by plaintiff has been made as to the right of a licensee to contest validity in an infringement suit.

cular. The system subjects the articles to be painted to the rim, and not the hole, of the doughnut. The circular path of the articles also permits an extension of the length of time to which the articles are exposed to the spray, allowing the gradual build up of the coating to any desired thickness.

### Validity.

Defendants do not contend that any cited art anticipates any of the five patents in suit. They do claim that:

1. All five patents are invalid for lack of novelty, or of invention over the prior art;

2. Starkey '417 is invalid as double patenting over Starkey '536;

3. Crouse '893 and Ransburg '894 are invalid because of prior public use.

The statutory presumption of validity through the issuance of the patent, U.S. C. Title 35, § 282, is strengthened in this case by:

(a) The tortuous path of the patents through the Patent Office, during the course of which the patents now relied upon by the defendants were considered by the Examiner, and most of them made of record at the foot of the patent; (b) the upholding by the Seventh Circuit of the validity of the Starkey '536 and '417 patents, and obliquely of the validity of the Crouse '893 and Ransburg '894 patents, Binks Manufacturing Company v. Ransburg Electro-Coating Corp., 7 Cir. 1960, 281 F.2d 252, cert. gr. 1960, 364 U.S. 926, 81 S.Ct. 353, 5 L.Ed.2d 265; writ dismissed, 1961, 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239; and (c) the very striking commercial success enjoyed by the patents.

The parties seem to be in agreement that Starkey '536 and '417 are the "basic" of the five patents, and that the other three are in the nature of "improvements." In Binks, the Seventh Circuit referred to the Starkey patents as "a broad and basic invention" (281 F. 2d at 256), and referred to the rotating bell or disc as a "mere improvement" (281 F.2d at 256), or "at most improvements" (281 F.2d at 261).

It would therefore appear that it should be possible generally to consider the patents relied upon by defendants, rather than discussing them with respect to the individual patents. They are:

E. Pugh     1,855,869     April 26, 1932
Method and apparatus for Coating Articles.

Darrah     1,958,406     May 15, 1934
Electrical Spraying Device

Gravley     2,359,476     October 3, 1944
Electrostatic Method and Apparatus

Hopkins, et al.     1,861,475     June 7, 1932
Method of Applying Lacquer or the Like

Chaffee, et al.     1,832,096     November 17, 1931
Electrical System

Harper J. Ransburg,
    et al.     591,474 (British)     August 9, 1947
Apparatus for Spray Coating Articles

Harper J. Ransburg,
    et al.     452,041 (Italian)     October 6, 1949
Method and Device for the Electrostatic Coating of Objects.

The first six of these were considered by the Patent Office in the prosecution of the various patents, and were made of record.[14] Darrah and Gravley were considered in Binks, 281 F.2d at 255.

Pugh 1,855,869 discloses a coating system in which finely divided particles are produced by compressed air atomizers, which discharge into a chamber through which the articles to be coated are carried by a conveyor. The atomizers are slightly rearward of, and discharge through holes in, one wall of the chamber. The articles to be charged are at ground potential. The nozzles and chamber walls are positively charged.

The uncontradicted evidence is that the charged wall would substantially shield the atomizer, resulting in a weak field at the point of atomization.[15]

Darrah 1,958,406 discloses electrostatic atomization of liquids by an apparatus in which one or more capillary nozzles or tubes are surrounded by a ring-like electrode between which and liquid in the nozzles or tubes an electrostatic field is maintained. Apparently a spray was claimed to be electrostatically produced and projected beyond the ring electrode. There is no reference to or disclosure of a spray-receiving object to attract or receive the deposition of the spray. The only uses suggested by the patent were in dust collection, and in the promotion of chemical relations between the atomized liquid and the gas into which it was to be atomized.

The references in the Darrah patent to particles which "remain suspended indefinitely in air"[16] and the suggested use of alternating current, which would not be used or usable if deposition were desired[17] negative its application to coating operations. Moreover, Darrah, the

holder of some 100 patents, testified by deposition that he had never found any practical use for his invention;[18] and that even after he saw electrostatic painting demonstrated, he had no "ideas as to how [his] apparatus might be made to work."[19]

Gravley 2,359,476 discloses a system for removing excess paint from articles which have been previously painted, as by dipping. By gravity, the excess flows as "tears" to low points, and is drawn from the painted article by electrostatic atomization and attraction to a charged grid. So far as the process is concerned, the excess paint may leave as large drops, small drops, or mist. The process is essentially a decoating one. In such decoating, it is the removal that is all-important; not the size of the drops nor their ultimate disposition or deposition. Perhaps the larger the drop, the quicker and better the detearing. But entirely different problems are presented, and different end results desired, in coating articles commercially. The large drops (slugs) will cause a raised and pitted finish; too small particles will dry too rapidly, and cause unsatisfactory adherence. Further, the object of detearing is to get rid of a fixed quantity of paint once and for all. In electrostatic coating, the atomized paint must be replenished at a uniform and controlled rate. Gravley, rather than teaching the art of the patents in suit, would indicate that electrostatic forces were not suitable for coating.

Hopkins 1,861,475 discloses a centrifugal atomizer in which the coating material is atomized in the form of an extended film from the edge of a rotating cone. The disclosures and claims relate to atomization without the direct action

14. The Starkey '536, the Crouse '893, the Ransburg '894 and Simmons Re. '602 were all assigned to "Cl. 117–93" by the Patent Office; an Starkey '417 to "Cl. 118–51."

15. Tr. 3443–44; 3453–54. The witness also testified that to the best of his knowledge, Pugh had never been used commercially. Transcript 3442.

16. Specifications, page 2, line 35.

17. Transcript, 3437.

18. PX 258, page 5.

19. PX 258, page 30. Particularly in view of the well-known claiming proclivity of inventors, this certainly tends to negate "obviousness" of the inventions in suit.

of compressed air thereon, or its admixture therewith. The spray, centrifugally produced, "tends to fly in all directions" [20] and is directed toward the object to be coated "by projecting a hollow jet or stream of compressed air from the gun in the direction of the work and surrounding the spray, so as to form in a sense a sheath or envelope which encloses the spray and causes it to follow a certain course. The compressed air does not constitute an atomizing medium, nor does it even form a carrying medium in the usual sense * * *" [21]. The recommended speed was 10,000 r. p. m.

Hopkins does not disclose or claim the use of an electrostatic field in any aspect; on the head, at the point of atomization, or for charging or deposition.

Chaffee et al. 1,832,096 was intended to produce electrical charges on discrete particles of matter, such as sand, clay, marble dust, cement dust, and the like, to dissolve clouds and fog, and to produce rain, or to dissipate or dissolve dust clouds, smoke clouds, or the like.

It is difficult for the court to conceive the relevance of the Chaffee citation. Clearly the inventor is not concerned whether the "rain falleth upon the just or the unjust"; nor is the desire to coat, an object of the invention. Further, the last that the inventor or the users of the invention would desire would be the replenishment of the source to be "dissolved or replaced", let alone its replenishment at a uniform rate.

Harper J. Ransburg, et al. 591,474 (British). This patent was cited of record by the Patent Office in the issued patents on '893 and '894. It is particularly "directed to safety equipment and control apparatus for handspraying in an electrostatic field, wherein the spray gun may be grasped and manipulated by an operator * * *" [22] Primarily, the operator, the cage in which he operates, the articles to be coated, and the spray gun are grounded, while the electrode past which the particles atomized by the gun are projected is at high potential.[23] Alternatively, it is stated that the operator and the gun may be of the same potential as the electrode; the electrode may be carried directly upon the gun forwardly thereof in spaced relation.[24]

It is obvious that this is a Ransburg No. 1 Process. The patent refers to "Apparatus for Spray Coating Articles." It does not disclose or claim an electrostatic atomization. At the most, it relates to relative locations of the electrode at which charges are to be imparted. As shown below, under the discussion of infringement, either no, or an impaired, charge could be imparted, where the atomizing gun and the electrode, no matter how associated, are of the same potential.

More particularly, 591,474 (British) does not teach electrostatic atomization, or atomization at the point of highest field strength.

Harper J. Ransburg, et al. 452,041 Italian. Apparently defendants do not contend that its disclosures, which are similar to those of Crouse '893 and Ransburg '894, are anticipatory thereof. They do contend that the Italian Patent either anticipates, or discloses an invention in view of which Reissue 24,602 would be obvious to one skilled in the art. Apparently this contention is based upon Figure 9 which defendants claim shows an atomizer used vertically, between two straight-line conveyors parallel to, but spaced away from, the surfaces to be coated. It is defendants' position that these atomizing heads *may* be (a) reciprocated, (b) rotated and (c) positioned between two conveyors.

As the court construes the specifications, and Figure 9, there is taught the use of an atomizer arranged above a double row of articles moving on a single conveyor, in which the centrifugal and

20. Page 1, lines 61–62.

21. Page 1, lines 67–74.

22. Complete Specifications, page 1, lines 24–25.

23. Complete Specifications, page 2, lines 108–112.

24. Complete Specifications, page 3, lines 7–77.

electrostatical forces act in the same direction and not at an angle to each other; and, perhaps more importantly, the reciprocation is used only to position the atomizer *inside* hollow articles. This is completely different from, and not anticipatory of, or teaching, the use of the doughnut pattern as disclosed in Re. 24,-602.

The court is of the opinion that the Patent Office was clearly right in holding that the patents in suit are valid in view of the state of the prior printed art.

### The Alleged Dukes Use.

Defendants assert that apparatus allegedly designed and built by Dukes in 1949 is a substantial anticipation of the Crouse '893, Ransburg '894 and Simmons '602 patents, as a prior public use.

Summary disposition can be made of this contention as to Simmons '602. On the weight of the evidence the court finds as a fact and concludes as a matter of law that Dukes did not position his spray head or heads as was done by Simmons, but sprayed paint vertically to a moving conveyor.[25] In any event, the second device, relied upon by defendants, functioned unsatisfactorily,[26] and could not be considered anticipatory of Simmons, which, on the testimony and as witnessed by the court, is an eminently satisfactory operation.

Dukes had been employed by a very well-known manufacturer of air gun spray type equipment. In 1946, Dukes decided to go into business for himself. Prior thereto, he had worked on the design of a centrifugal disc spray device. He began his independent operations with air gun spraying, dipping and flow coating, and then began to experiment with centrifugal rotating disc atomizers. Various modifications of spacing between the discs, and different feed systems,

were tried. These sprayed vertically to a moving conveyor. Dukes testified that in 1948 or 1949 [27] he used an electrostatic field, directly charging the gun and the work. The specific device relied upon by defendants was, fortunately or unfortunately, allegedly destroyed by a fire in 1953. Importantly and remarkably, Dukes although still in the job painting business, has never since returned to the equivalent of the Simmons '602, nor, apparently, to the Ransburg '894.

Significantly, as will be developed under the question of infringement, Dukes found that the particle size in all his operations, decreased with the field on [28]; and it never occurred to him, despite his wide experience, to use electrostatic forces in painting until he saw the Ransburg applications.[29]

It is extremely doubtful if the evidence as to the alleged Dukes prior use, even as above limited, could be considered as proof "clear, satisfactory, and beyond a reasonable doubt", Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed Wire Co., 1892, 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir. 1935, 80 F.2d 912, 923; Colgate-Palmolive Co. v. Carter Products, Inc., 4 Cir. 1956, 230 F.2d 855, 861. Were it necessary, the court would find as a fact, and conclude as a matter of law, that the proof offered did not meet the above requirements as to Crouse '893 and Ransburg '894.[30] However, it is clear that in any event the effective dates of the '893 and '894 patents (March 5, 1948 and October 29, 1948, respectively) well precede any possible date attributable to Dukes. Each was a continuation-in-part application—an application which contained both subject matter taken from an earlier application, and new subject matter not disclosed in the earlier application. No contrary signifi-

---

25. Transcript, pages 2295–97.

26. Transcript, page 1955.

27. 1949 is clearly the earliest possible date, as it was only then that he acquired his first "power pack", permitting the imposition of positive and negative charges.

28. Transcript, page 2023.

29. Transcript, page 2031.

30. Simmons '602 has already been ruled out factually, even accepting the Dukes' testimony as credible.

cance can be drawn from the date shown in the heading of a patent resulting from a continuation-in-part application, which is always that of the continuation in part, never that of the original application. Ex parte Ellis, 1919, C.D. 64, 264 O.G. 863, Ex parte Komenak, 45 U.S.P.Q. 186. The cusp-forming feature of the electrostatic field had been disclosed in the 1948 parent of the '893 and '894 pat-ents.[31] The '893 and '894 claims in suit are entitled to the parents' filing dates. Davis Co. v. Baker-Cammack Hosiery Mills, D.C.M.D.N.C.1949, 86 F.Supp. 180, 186, aff'd., 4 Cir. 1950, 181 F.2d 550, 558.

### Double Patenting.

Defendants contend that the Starkey '417 apparatus patent is invalid as "double patenting" over the Starkey '536 method patent. This contention was also made in the Binks case, and decided adversely to the position of defendants, Binks Manufacturing Co. v. Ransburg Electro-Coating Co., 7 Cir. 1960, 281 F. 2d 252, 257, on reasoning entirely satisfactory to this court. See also, Hartford-Empire Co. v. Obear-Nester Co., 8 Cir. 1934, 71 F.2d 539, 561; Fehr et al. v. Activated Sludge Co., 7 Cir. 1936, 84 F.2d 948, 957.

The court therefore concludes that the patents in suit are, and each of them is, valid. In the court's opinion, the validity of the patents is clear. Were this a "close" case on the question of validity, the striking and unusual commercial success (Hutzler Bros. Co. v. Sales Affiliates, 4 Cir. 1947, 164 F.2d 260, 267; Florence-Mayo Nuway Co. v. Hardy, 4 Cir. 1948, 168 F.2d 778, 781; B. F. Goodrich Co. v. United States Rubber Co., D.C.Md. 1956, 147 F.Supp. 40, 73, affirmed 4 Cir. 1957, 244 F.2d 468) and the tribute of praise to the prior art but the tribute to the patent by defendants' copying (Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 441, 31 S.Ct. 444, 450, 55 L.Ed. 527; Ackermans v. General Motors Corp., 4 Cir. 1953, 202 F.2d 642, certiorari denied 1953, 345 U.S. 996, 73 S.Ct. 1139, 97 L.Ed. 1403, rehearing denied 1953, 346 U.S. 842, 74 S.Ct. 16, 98 L.Ed. 362; Florence-Mayo Nuway Co. v. Hardy, 4 Cir. 1948, 168 F.2d 778, 782) would easily weigh the scales in plaintiff's favor.

### Infringement.

In the early 1950's, after the Ransburg No. 1 Process had been on the market for a number of years, the Sedlacsiks, under the name of Scientific Electric Company, (Ionic) began the sale of an electrostatic spray-coating system using a compressed air spray gun.[32] After the Ransburg No. 2 Process became publicly known, following its 1951 public disclosure, the Sedlacsiks built and exhibited an airless electrostatic spray-coating system, employing an atomizer, later known as the Model 12. That atomizer had a rotating, conical, electrically charged head, on which the paint was formed into a film, and fed to the rim of the head, by centrifugal force, and from that rim was atomized, dispersed and deposited under the influence of a high-voltage electrostatic field maintained between the head and the work. In 1956, the Sedlacsiks began exhibiting a second atomizing device, known as the Model 50, which likewise employed centrifugal force to feed the paint in a film to the rim of a rotating electrically charged disc or bell-shaped atomizer. Whether the atomization therefrom is purely centrifugal, purely electrostatic, or an aggregation or a combination of the two, and if so in what significant proportions, is the basis of dispute on the question of infringement.

After this suit was started, Ionic began selling a third form of atomizer, known as the Model M–50, which com-

---

31. PX 47 A, page 3; PX 48 A, page 7.

32. This was a studied, and apparently successful, technical modification that avoided literal infringement. This has been indicative of Ionic's procedure—noncreative, but evasive. If successfully evasive, it is of course legal; but it does not elicit a sympathetic or liberal approach; as subsequent matters of credibility will re-emphasize.

prised two Model 50 devices on a common support. Plaintiff charges that all three, Models 12, 50 and M–50 are infringements of the patents in suit.

In 1955, defendant Proctor was using, under license from plaintiff, the Ransburg No. 2 Process in the painting of ironing boards with equipment employing a plurality of rotating heads disposed on horizontal axes and arranged to project over-lapping conical sprays axially toward ironing table parts moved through the sprays in a straight path. At Proctor's request, plaintiff designed an additional No. 2 Process installation employing a plurality of rotating atomizers disposed on vertical axes, and a conveyor of the type shown in Re. 24,602 for carrying ironing board tops in a circular path around the atomizers. In 1955, plaintiff submitted to Proctor drawings and other data relative to such equipment, and accompanied such data with a proposed license contract covering installation and use of the proposed system. Proctor did not accept the contract submitted by plaintiff. Instead, Proctor entered into negotiations with Scientific Electric Company, and after several months, and after the disclosure of the general nature of Proctor's negotiations with plaintiff, was shown a Model 50 device. Proctor eventually purchased two Model 50 atomizers (on a hold-harmless agreement) and incorporated them into an installation which, except as to the contour of the path to be traversed by the work, was a duplicate of the additional No. 2 installation designed and submitted by plaintiff. The infringement with which Proctor is charged is the use of equipment which includes the two Ionic Model 50 atomizers.

All of the systems accused as infringements of the patents in suit embody one or more rotating atomizing heads which spread liquid coating material fed at a controlled rate into a thin, uniform film presented circularly to an elec-trostatic field created by applying a negative electrical potential, usually in the nature of 90 KV, to the atomizing head while the articles to be coated are maintained at ground potential in positions spaced from the head at distances such that arcing will not occur. Except perhaps with respect to liquid coating material which is not readily electrostatically atomizable [33], at the rim of the head the field is of liquid-atomizing strength. The field is therefore "of sufficient strength to" electrostatically atomize, or "capable of" such atomization. In such field, the edge of the film is formed into a series of spaced cusps, the tips of which repeatedly and continuously break off to form fine, electrically charged particles, which are electrostatically deposited on the work by the electrostatic field. At the tips of the cusps, where atomization takes place, the field is strong, and the lines of force are highly concentrated. Each particle, as formed, bears a substantial and effective "in-born" or "built-in" electrical charge, as the result of which the particles are electrostatically urged to follow the lines of force toward deposition on the work.

Defendants contend that all of plaintiff's patents (except Simmons Re. 24,-602) require that the paint "is and must be atomized through electrostatic forces *alone* to the *exclusion of any other force.*" [34] This is based upon the alleged limitations in the claims (heretofore discussed) in said patents, and by their history as disclosed in the various file wrappers. In substance, defendants claim that with knowledge of the limitations of the prior art, they deliberately departed from the idea of electrostatic atomization, and developed the accused devices, which they contend constitute centrifugal, as distinguished from electrostatic atomizers.

The contention of deliberate and learned departure from electrostatic atomization, and the development of cen-

33. There was no evidence that defendants commercially, or ever, used coating materials which were not, in business operations, readily electrostatically atomizable.

34. Transcript, page 4267, emphasis supplied.

trifugal atomizing devices, deserves and will receive summary disposition. Sedlacsik, Jr. testified as to his thorough search, anticipatory of such alleged development, of the patent files in the New York Public Library in 1949, describing the physical layout of the patent section, and the way in which various patents were assembled and bound. Subsequent evidence, not challenged, showed a filing system in the Library so different at the time of the alleged search from that described by Sedlacsik that his testimony is unworthy of belief, and is unacceptable to the court.

Secondly, all of defendants' devices do call for a charge on the atomizing head. As will later be considered in more detail, defendants claim that nevertheless the atomization is centrifugal only. For reasons to be stated, the court finds to the contrary.

Third, on July 14, 1959, on an application filed August 18, 1958, there was issued to J. Sedlacsik, Jr. Patent No. 2,-894,485, "Apparatus for Electrostatically Applying Multi-Coatings". This discloses a variety of atomizer arrays "each employing one or more atomizers and one or more deflector heads which may be rotary and/or electrostatic." [35] A conventional high voltage source is connected between ground and the atomizers.[36] Normally paint is centrifugally moved to the peripheral edge of the atomizing disc where it "is atomized due to the centrifugal action *and the electrostatic charge* of the particles * * *" [37] Claims 1, 7, 15, 16 and 20 relate to atomizing heads with "an electrostatic field between said atomizer array and said articles for atomizing and depositing said coating materials on said articles * *" The M–50 admittedly is within this patent coverage. The court is unable to understand how the use of an electrostatic field related to a charged atomizing head "for atomizing" can represent a studied and successful (!) effort to get away

from electrostatic atomization and solely into centrifugal atomization; or why an electrostatic force should atomize paint on a Sedlacsik device, but not on plaintiff's devices; or why, if atomization is to be, and will be, solely centrifugal, any charge is placed on the atomizing head.

The question of file wrapper estoppel or limitation of plaintiff's claims through Patent Office procedure is difficult to summarize. As stated, it is defendants' position that plaintiff's patents are all limited to electrostatic atomization through electrostatic forces alone, to the exclusion of any other force. It is possible technically to dismiss this contention in its literal sense by pointing out that the Patent Office in allowing claims for any device except a stationary one, necessarily allowed claims calling for a force other than electrostatic force alone; a rotating head of necessity introduces *some* mechanical force. In an effort to escape this dilemma, defendants' counsel argued that centrifugal force could be used with the field on, resulting in electrostatic atomization up to the speed at which centrifugal atomization would have occurred had there not been a field; at any and all higher speeds, atomization was no longer electrostatic (within the patent coverage) but centrifugal (outside the patent coverage). Plaintiff claims that as long as the paint is made the electrode, or the paint is atomized at the point of greatest field intensity so that the benefits of the "in-born" or "built-in" charge are obtained, the patents are infringed whether or not, and if so at what rate, rotation occurs.

The court concludes that the Patent Office procedure does not support defendants' contentions, in the literal, or their somewhat broader, aspects. Whether they support the contention of plaintiff in its broadest aspects it will not be necessary to decide.

In the prosecution of the '894 patent, all the claims were rejected by the Ex-

---

35. Column 1, lines 33–35.

36. Column 3, lines 1–2.

37. Column 3, lines 44–51; emphasis supplied.

aminer on a hypothetical aggregation of Crouse with either Hopkins or Chaffee.[38] He concluded that "It is not seen to be inventive to use Hopkins' spreading means, i. e., rotating means, in Crouse's apparatus or to use Crouse's charging means in Hopkins' apparatus"; and that "no invention is seen in rotating Crouse's gun according to the teachings of Chaffee whose disclosure shows the charging of liquid particles in a gun similar to that of Crouse except that it is rotated to distribute the material to be charged." [39]

The action of the Examiner was appealed to the Board of Appeals. At the hearing before the Board, appellant offered motion pictures showing applicant's atomizer and that of the Hopkins reference in action. The hearing room could not be darkened;[40] the pictures were projected, but visibility was so poor that leave was given to file "stills" from the individual frames of the motion picture films. This was done.[41] These showed, with respect to "open" articles, such as one-inch metal tubes disposed on three-inch centers, that with a cup-shaped atomizing head described in the appealed claims, with a head speed of 900 r. p. m. and a head potential of 100 KV, the paint was finely atomized. Some of the paint, under the influence of the momentum acquired from electrostatic forces during the movement from the head, passed between the adjacent tubes, and then, still under the influence of the lines of force, changed its direction and was deposited on the rear of the tubes.

Another "still" showed a scaled reproduction of the head shown in Fig. 2 of the Hopkins reference. It had a head speed of 10,000 r. p. m. (the speed recommended by Hopkins) and a head potential of 100 KV and an air pressure ring at 15 p. s. i. Despite the effect of the electrostatic field, much of the paint was carried past the work and lost as overspray, due to the force of the air sheath.

Another "still" was taken under the same 10,000 r. p. m. and 15 p. s. i. conditions but with the head uncharged. A substantial overspray loss again occurred, and in addition, the air sheath (unaided by electrostatic forces) was unable to divert all the centrifuged paint even toward the target, some paint being thrown centrifugally through the air sheath and falling to the floor between the head and the target (or work).

In a six-page opinion, the Board of Appeals affirmed the Examiner, saying that "the examiner has properly combined the references and that such combination anticipates the appealed claims." [42] The Board admitted that if Hopkins were modified merely by charging the head, appellant's criticism of loss of paint by "overshooting the work" was valid, but suggested that "the air stream may well be omitted * * *" ! [43]

That appellant would not readily be satisfied[44] with this decision, or the

38. Other grounds were advanced by the Examiner, but were abandoned.

39. PX 48 B, page 71.

40. Persons accustomed to the most complex patents apparently could not solve an ordinary problem, even by moving to another room.

41. PX 48 B, pages 168–171.

42. PX B, page 175. "Anticipation" by an hypothetical combination or aggregation seems extreme. Possibly the Board meant lack of novelty was shown.

43. PX 48 B, page 175.

44. Neither the Examiner nor the Board claimed that Crouse, Hopkins or Chaffee provided any criteria in their disclosures for these ex post facto selections, assemblies and omissions. Hopkins was concerned exclusively with centrifugal atomization, and the use of an air sheath to prevent the particles from being thrown off radially, and to direct them toward the work. He contemplated no grid or field, much less a charged atomizer. Moreover, it is at least doubtful if the atomizer could successfully work if charged, as it appears to be shielded, which would eliminate or greatly reduce the field. To eliminate that which was essential to Hopkins, in order to add something he did not contemplate or desire, and possibly could not use, is an

basis thereof, may well be imagined. A civil action was filed in the United States District Court for the District of Columbia. Before the case came to trial, a conference was had with the Primary Examiner. He was favorably impressed with the contention that while the Board of Appeals had apparently concluded that since either an electrostatic field or centrifugal force can atomize liquid, applicant's claims were directed to nothing more than an aggregation of the atomizing effects of electrostatic and centrifugal forces; applicant in fact used centrifugal force to present the liquid to the field in such a form that the field was able to produce finer atomization; a combination, rather than an aggregation.

There were produced and filed two photographs,[45] showing the operation of the claimed invention using a bell-type and a disc-type atomizer.

The bell had a diameter of four inches, rotating at a speed of 900 r. p. m., and with an electric potential of 100,000 volts. The disc had a diameter of twenty inches, rotating at a speed of 2,000 r. p. m., and with an electric potential of 100,000 volts. In each instance the formation of cusps and the atomization and dispersion of particles from the tips thereof under the influence of the field was apparent. While certainly the rotation of a twenty-inch disc at 2,000 r. p. m. would produce some centrifugal atomization, it was claimed that the centrifugal force existing in either atomizer was far below what would have been required to produce centrifugal atomization of the fineness shown in the photographs.

Thereafter a new application was filed as a continuation of and a substitute for the current application, and it was allowed without amendment as the '894 patent, and the suit in the United States District Court for the District of Columbia was dismissed.[46]

Certainly this procedure in the Patent Office did not limit the scope of plaintiff's patents to claims in which the paint is, and must be, atomized through electrostatic forces alone, to the exclusion of any other force. The centrifugal force represented by rotation of a twenty-inch disc at 2,000 r. p. m. is certainly *some* force other than electrostatic force alone; and at least the participation (and assistance, in the sense of forming, thinning and presenting the paint to the field) of centrifugal force is too clear for argument.

The court is of the opinion that the minimum clearly allowable to plaintiffs as the result of the Patent Office prosecution is that plaintiff's patents cover any case in which the paint, as presented to the field (by gravity,[47] or centrifugal force) is then atomized under circumstances in which electrostatic forces either predominate, or form a significant factor.

Defendants admit that in their Model 12 device, "[p]erhaps the electrostatic

extremely tortuous and attenuated approach to invalidate claims.

At least as remote is the aggregation of Hopkins and British Ransburg 591,474 which defendants contend is the equivalent of a Model 12. As pointed out in the discussion of that patent, supra, it is primarily a Ransburg No. 1 Process. It does not teach electrostatic atomization, or atomization at the point of greatest field strength.

If defendants wish centrifugally to atomize and project spray through a grid, as in Ransburg No. 1 Process, they are probably free to do so. However, in all instances they apply the field directly to an unshielded head, as taught by the patents in suit.

45. PX 48 B, 186, 187.

46. After allowance but before issuance the title was changed from "Method and Apparatus for Electrostatically Atomizing Liquid" to "Method and Apparatus for Electrostatically Coating" on the representation that " * * * the allowed claims are not directed to an electrostatic atomizing system but rather to a complete coating method or apparatus in which an atomizing step, or an atomizer is only one of the recited features." PX 48 C—pages 37–38.

47. Which might itself be considered a "force" non electrostatic in nature.

field has a minor effect upon the atomization."[48] They claim, however, that as there is a concurrence of centrifugal force with electrostatic forces, there can be no infringement—an approach which the court has rejected.

Alternatively, defendants contend that in fact, in the operation of the accused devices, the atomization is not electrostatic, but centrifugal. This is based in part upon the testimony of Sedlacsik, Jr., but primarily upon the testimony of two "experts"—Dr. Charles L. Mantell and Harry J. Green. Sedlacsik, Jr. and Dr. Mantell were open advocates; Green a less obvious one. Their testimony is not convincing, per se, or in the light of visual demonstrations and exhibits.

Sedlacsik, Jr., Mantell and Green each testified that in the commercial operations conducted by defendants, the paint was not on the charged atomizing head long enough to receive a[49] charge; the atomization was solely centrifugal. The particles so atomized were then charged by the "field"; apparently primarily immediately adjacent to the edge of the rotating head, where a corona-like field existed; but in part the charging might occur along the pathway of the particle toward the work.[50] Mantell and Green further testified that under the influence of the field, originally centrifugally formed particles might further atomize—which, if true, would seem to be electrostatic atomization, although Mantell denied this.

This testimony seems to mean that the paint, at a peripheral speed of 133 m. p. h. at the edge of the head, and electric forces, moving at 186,000 miles a second, both leave the edge of the head without any charge being imparted; but immediately upon centrifugal atomization occurring, most of the articles receive a charge. Admittedly, in the paints ordinarily used, with the field on, electrostatic atomization occurs when the head is stationary; and it occurs when the head is rotated at any speed just short of that where centrifugal atomization would take place if the head was not charged. In these cases, the electric charge has "time" to charge and electrostatically atomize the paint. But defendants contend that as soon as a rate of rotation sufficient centrifugally to atomize is reached, then whether the head is charged or not, the atomization becomes solely centrifugal.

On some of the heads, 900 r. p. m. seemed the point at which centrifugal atomization would occur. According to defendants' position, at 0 r. p. m., 1 r. p. m., etc. up to 900, the atomization is electrostatic (centrifugal force merely presenting the paint to the rim in a continuous film for electrostatic atomization); but, at 901 r. p. m. centrifugal force takes over and ousts the charge as an atomizing agent; the paint does not stay on the head or at the rim a time long enough to be atomized: Were this the case, there would be no point in charging the head; the creation of a field immediately adjacent the edge of the head would suffice.[51] But defendants do charge the heads, despite the insulating problems so created.

48. Final brief, page 31.

49. Dr. Mantell was not entirely consistent. At one point he seemed to indicate that the paint might receive a partial charge at the rim of the atomizing head, but that such charge would be insufficient to effect electrostatic atomization.

50. The charging, for purposes of dispersion and deposition, out of the line of greatest electrostatic intensity, is a concept presenting some difficulty to the court, particularly where the face of the head is parallel to the work. The result of purely centrifugal atomization would be the throwing of particles off the edge in a circular pattern, none of which would be likely to reach the work. If the centrifugal force were sufficient to throw particles through the field at its point of greatest intensity, without receiving a charge, it is hard to understand why they would, travelling away from the field, later come under its influence.

51. In fact, Green testified that in his opinion a modification of Ransburg No. 1, in which paint was centrifugally atomized and thrown into a grid field, would be better; there was a loss by placing the field at the "top" of the disc.

This effort to use the teachings of the Ransburg patents but to deny their efficacy is suspect.

When the first accused Ionic system was initially brought out, head speeds were low. In an early magazine article, Sedlacsik, Jr. described the speed of the Model 50 as "variable from 400 to 2,000 r. p. m." During 1956 and 1957, the Model 50 speeds recommended to customers were in the 1,150–2,500 r. p. m. range. In January 1958, Sedlacsik, Sr. said that with respect to the Model 12, speed "is not important. Anywhere from several hundred to several thousands." In January 1958, Sedlacsik, Jr. deposed that the standard speed of the Model 12 was 1,500 r. p. m., although it was capable of variation from 0 to 4,000 r. m. p.

During the trial, as the defense of centrifugal atomization developed, it was testified that the recommended Model 12 speed "in most cases" was 4,000 r. p. m. and could reach 7,000 r. p. m. The trial testimony was that the other (disc-type) heads normally operated "in most cases" at 2,000 to 4,000 r. p. m.

During the trial of the case, Sedlacsik, Jr., in his effort to show how completely centrifugal force overcame electrostatic forces, testified [52] that at speeds where centrifugal atomization would take place, 25 to 50 per cent of the particles are mechanically projected and deposited on the work, the electrostatic field having no influence on them at all. He was asked how, if this were the case, some of these particles were not cast in the direction of the spaces between articles to be painted, and so would pass through, and be lost. He replied that with the field on, "being the particles are cast through the charged zone, they pick up a sufficient charge to effect wraparound of any particles that would be normally going through the part, beyond the part."

He repeated this testimony, saying: [53] "In other words, what I am trying to say is that any particles which would be—well, let me explain it this way:

Without the electrostatic field, you are depositing X amount of particles on the object, and the balance of these particles would be driven through and would deposit or fall out on to the floor, whereas when the electrostatic field is applied in that case, the particles which would normally fall out would be precipitated over to the object either directly in front of it or effect wraparound."

Perhaps the most charitable interpretation of this would be to call it absurd. According to Sedlacsik, Jr., all particles start centrifugally atomized and uncharged. All pass through an electrostatic field. Those (some 25 to 50 per cent) which by mechanical force happen to be directed so that they would hit a moving target remain uncharged. Those which by virtue of their direction would miss the moving target become charged, and so are deposited either directly, or as wraparound. The basis of selectivity by which the field determines those not properly aimed, and kindly charges them and them alone, and passes by the others, is not disclosed or suggested. Somehow or other, the mechanically properly aimed particles carry little "Keep off" signs, and those that would be lost have "Help wanted" signs; which signs are invariably read, understood and obeyed by the electrostatic field.

To the court, the contention of plaintiff is far more plausible that when the field is on and the head is not shielded, with or without rotation, the atomization is electrostatically effected, or at least occurs at the point of greatest field intensity; that all particles are given their charge at that time, and then follow their predestined course along the various lines of force from the head to the work.

Green admitted that his theory that at high rates of rotation the paint did not remain on the head long enough to receive a charge, and that the charge was imparted as the particle traveled from the head toward the work, and that further break-up occurred in flight, did not

52. Transcript, pages 2642–2648.

53. Transcript, page 2646.

occur to him until after the trial had begun. It developed from his observation of the operation of Ionic devices and his study of high speed pictures of such operations, and of various spot sizes found on "zip strips." [54]

This post litem motam theory might well be compared with the statements by Green in the application for a patent on the Ransburg No. 1 System, of which Green was a co-inventor, in which it is said that where "the gun itself is the discharge electrode * * * all particles of the spray may then *be expected to be electrically charged* * * *" [55]

Green admitted that he had had no experience with centrifugal atomization, and several times wondered why he was being retained by defendants, and how he could help. Apparently he found out, in time to testify.

Despite his professional background, the court doubts Dr. Mantell's qualification as an expert in this case. [56] He testified [57] that in electrostatic atomization, cusps formed in radial lines, projecting almost radially outward, and at the end the cusp breaks into droplets. In centrifugal atomization "cusps" form, curl, a drop or "tadpole" is formed, larger than the ligament (umbilical cord) attaching it to the mother liquid, and it is then torn or whipped off. Apparently the umbilical cord retracts, and the process is repeated. He further testified that on the high speed motion pictures of defendants' devices in operation, some of both types of atomization could be seen—(in which event the atomization is clearly not wholly centrifugal). However, he flatly refused [58] to examine stills taken from these very motion pictures and say if they were taken with the field on or off—a determination that the court was able successfully to make for itself some months later at the argument, and without having first referred to the labels.

His "clincher" that atomization on Ionic devices was centrifugal was that only about 100 watts of power were supplied to the field, while a one-half horse power motor (378 watts) was used to rotate the head, therefore the effectiveness of the centrifugal force must be approximately four times that of the field, is a patent non sequitur.

That Mantell was an advocate was demonstrated in his insistence that electrostatic atomization existed only if the disrupting electric force were imparted and received at the face or edge of the head. In his opinion, if a drop were formed mechanically, and was further

54. So called because solid strips of paper or aluminum would be placed between the head and the work, and then quickly pulled or "zipped" away. A number of particles would be intercepted, and deposited on the strip.

55. Patent No. 2,247,963, issued July 1, 1941 to Harold P. Ransburg and Harry J. Green, column 1, lines 36 to 38. Emphasis supplied.

56. In over 88 pages of the Transcript (3067–3154) largely intended to indoctrinate the court into the mysteries of the electrostatic field, with blackboard and a "Listen My Children and You Shall Hear" technique, he insisted that an ampere is "the quantity of silver deposited per second" (3070, 3153–3154) and that "no voltage is set in that relation." (ibid.); that this was the Bureau of Standards definition.

The definition to which Mantell apparently intended to refer was that found in 15 U.S.C.A. § 221 before repeal in 1950, in which the ampere is defined as "the practical equivalent of the unvarying *current*, which when passed through a solution of nitrate of silver in water in accordance with standard specifications, *deposits silver* at the rate of one thousand one hundred and eighteen millionths of a gram per second." (Emphasis supplied).

Under Mantell's definition it might well be asked: "How many amperes in a dime, Doctor?"

The volt, the unit of electromotive force, was then defined, 15 U.S.C.A. § 221, as "the electromotive force that, steadily applied to a conductor whose resistance is one international ohm, will produce a current of an international ampere * * *."

57. Transcript, pages 3236–3237.

58. Transcript, pages 3253–3255.

broken up in and by the field; or if the charge were transmitted from the atomizing head through the umbilical cord to a centrifugally formed drop, and the drop thereby disintegrated, neither of these was electrostatic atomization.[59] To the court, particles that are electrostatically atomized are formed as the result of electrostatic atomization, no matter where they are so atomized.[60]

Although insisting that the atomization at 2,500 r. p. m. on a fifteen-inch disc was purely centrifugal, Mantell did say that the existence of a field on the disc made it easier to atomize mechanically; that a charge might be transmitted from the disc through the umbilical cord to a drop, causing its disintegration; and that (along with Green) further atomization after leaving the disc might be effected by the field—each of which certainly negatives purely centrifugal or mechanical atomization, and all of which strongly indicate, if, they do not in fact require, the conclusion that defendants are using plaintiff's patents and at least getting some benefit from them.

The plaintiff's expert, Dr. Emery P. Miller, was far more persuasive both in the manner and content of his testimony. His statement was not contradicted that with voltage applied to the head of the atomizing device (disc or bell) under any of the commercial aspects practiced by the parties, the spot size of the atomized particles was always smaller, at any particular speed of rotation, than at the same speed of rotation at no voltage.[61] This would show that the effect of electrostatic forces on atomization was never completely superseded or blanked out by centrifugal force. The court accepts this testimony, and draws the conclusion indicated. This would seem sufficient to constitute infringement under the holding in Tilghman v. Proctor, 1880, 102

U.S. 707, 26 L.Ed. 279—a case strongly relied upon by plaintiff in briefs and argument, but as to which defendants have attempted no answer or differentiation.

Tilghman's patent dealt with a method of creating fatty acids from fats. In the prior art this had been done by a process involving the treatment of fats with both water and lime in an open vessel, sometimes with the introduction of superheated steam, at temperatures below the boiling point of water. Tilghman discovered that the same result could be obtained by eliminating the use of lime, and treating the fats with water only, in a closed vessel at a temperature well above the boiling point of water (612° F. being preferred) but under sufficient pressure to prevent the water from boiling. His patent claimed " * * * the manufacturing of fat acids and glycerine from fatty bodies by the action of water at a high temperature and pressure."

The defendants in Tilghman used water, and lime in the proportions of 4–7 per cent (in place of the prior art 12–14 per cent), in admixture with fat, and a temperature of 310° F. In holding this to be an infringement, the court said:

> " * * * They use water in admixture with fat, heated to a high degree, far above the boiling-point, and yet subjected to such pressure as to prevent the water from being converted into steam; and though they may also use other things at the same time, which other things may facilitate the operation, or render a less degree of heat necessary than would be required when water alone is used, and thus actually improve the process of Tilghman; yet this process is included in their operation, and forms the basis of it. It is idle, therefore, to say that they

59. Transcript, pages 3241, 3251.

60. Mantell was also obviously in error in his conclusion that the centrifugal force at the periphery of a four-inch disc rotating at 5,000 r. p. m. would be greater than that at the periphery of a two-inch disc rotating at 10,000 r. p. m. Transcript, page 3232; see rebuttal, Transcript, pages 3590–3594.

61. See PX 100. Dukes, called by defendants, testified to the same observations.

do not infringe Tilghman's patent. It is unnecessary to determine what precise part the lime used by the defendants plays in their process; whether, as the complainant contends, it saponifies the fat to a certain extent, leaving the remainder to be acted upon by the water alone purely after the process of Tilghman; or whether, as the defendants contend, the lime produces a more perfect and active commixture of the fat and water, or predisposes the fat to unite with the requisite elements of water necessary for producing glycerine and the fat acids,— in either case the process of Tilghman, modified or unmodified by the supposed improvement, underlies the operation performed in the defendants' boilers." (102 U.S. 731–732, 26 L.Ed. 279).

\* \* \* \* \* \*

" \* \* \* It is probably true, as contended for by the defendant, that by the use of a small portion of lime, the process can be performed with less heat than if none is used. It may be an improvement to use the lime for that purpose; but the process remains substantially the same. The patent cannot be evaded in that way. The matter may be stated thus: Tilghman discovers a process of decomposing fats by mixing them with water, and heating the mixture to a high temperature under a pressure that prevents the formation of steam. It is a new process, never known before. The defendants seeing the utility of the process, and believing that they can use a method somewhat similar without infringing Tilghman's patent, put a little lime into the mixture, and find that it helps the operation, and that they do not have to use so high a degree of heat as would otherwise be necessary. Still, the degree of heat re-

quired is very high, at least a hundred degrees above the boiling-point; and a strong boiler or vessel is used in order to restrain the water from rising into steam. Can a balder case be conceived of an attempted evasion and a real infringement of a patent?" (102 U.S. 733, 26 L. Ed. 279).

But it is not necessary to decide this case by choosing a winner in the battle of the experts. In the court's opinion, irrefutable evidence, apart from opinions, exists that in none of the operations practiced by either plaintiff or defendants is electrostatic atomization eliminated. Reference has been made to the distinctive appearance of the cusps in purely electrostatic atomization from that of the "cusps" or balls or "tadpoles" incident to centrifugal atomization.[62]

First: High speed photographs[63] showing the forms assumed by the liquid at the rims of heads rotating at and above the speeds at which defendants' witnesses contended centrifugal force suppresses (eliminates) electrical atomizing effects, clearly show the persistence of electrostatic atomization.

Second: Motion pictures were exhibited by defendants of dual disc operations (M–50), the Model 12 and the Hopkins nozzle at various speeds and voltages. Because of the positions at which defendants had directed that the camera be placed, and the amount of, and lack of control over, the paint fed, definition at high speeds was equivocal. If it did not clearly identify electrostatic atomization, with the field on, it certainly did not establish its suppression. At lower speeds, the characteristic electrostatic atomization could be clearly observed.

One striking occurrence did take place. Motion pictures of the operation of a No. 12 device, at 350 to 6,000 r. p. m., with and without a field, were exhibited. One sequence was titled as showing the

62. Plaintiff graphically, but with over-simplication, characterizes electrostatic atomization as resembling a machine gun discharge, and centrifugal atomization as resembling sling shots.

63. E. g., PX 97, 98, 102, 233, 236.

operation at 6,000 r. p. m. with 0 voltage, and another at 6,000 revolutions with 100 KV. Dr. Miller, observing the pictures, noticed the "tadpole" structures in the sequence supposed to be with voltage on, and the characteristic electrostatic atomization in the sequence supposed to be with voltage off. He concluded that the labels or titling had been reversed. This was admitted by defendants. The court does not believe the error to have been intentional. It does show that recognizable differences existed between the two forms of atomization so unmistakable that a trained observer could distinguish, despite the labels; and that electrostatic atomization persisted at 6,000 r. p. m.

Third: The M–50 consists of two similar discs, of varying sizes. Normally they are spaced four inches apart, rotate in the same direction, and carry similar charges of like polarity. Since like charges repel, it would be expected that the field between the discs would be cancelled out, or at least be weaker than on opposite sides of the discs. Such is the fact.

In the course of defendants' demonstrations of the M–50 in action, the court observed [64] that there was a definite deposition of paint on the floor of the booth, heaviest in the space immediately between the two discs, and then fanning out noticeably for a radius of two and one-half to three feet, and then rapidly thinning out with some fine deposition up to the throat of the booth. There also appeared to be a cloud-like build-up between the two discs. Defendants argued that this had nothing to do with atomization, but only with an inadequate charging of the articles after formation. However, a high speed photograph [65] of all of one disc, and a portion of the other, clearly shows a mixture of centrifugal and impaired electrostatic atomization in the roughly 90° sections of the disc circumferences nearest each other, and purely electrostatic atomization in the remaining 270°.

Fourth: In view of defendants' theory that paint would not, at high speeds, remain on the surface long enough to be charged, and that particles were formed entirely by centrifugal force and acquired their charge in space, plaintiff prepared apparatus to test it. This apparatus was essentially a Model 50 system, except that two sharp-edged washers were installed, one immediately over and the other beneath the disc, each extending outwardly beyond the disc edge. The disc and the two washers were connected to the high voltage source, the washers thus acting as shields, and preventing any effective charge on the paint, and any atomizing field gradient at the disc edge.[66] The paint deposited with the washers removed (the normal Model 50 operation) was 75 per cent greater than when the disc was insulated and the washers provided the field. The ignorant paint apparently found that it *did* have time to acquire a charge while on the disc under ordinary operating conditions.

The court finds as a fact, and concludes as a matter of law, that the accused devices in operation do not atomize exclusively by centrifugal force, and do not supersede electrostatic atomization. Defendants concede that a charged disc assists centrifugal atomization. Plaintiff recognizes that centrifugal force increases the amount of liquid that can be electrostatically atomized in a given period of time, by presenting it to the field in a uniform, thin, replenished film.

Defendants are accordingly making use of the matters claimed in the claims in suit of the Starkey 2,685,536 and 2,794,417, the Crouse 2,893,893, and the Ransburg 2,893,894 patents, and are liable for infringement of such claims. It matters not that they may not be using all that is disclosed and claimed, or that they may be making an impaired use (as in the M–50 operation).

---

64. Transcript, page 565.

65. PX, 101 B.

66. PX 245; transcript, pages 3621–3631.

Even under defendants' theory, atomization occurs at the point of greatest field intensity.

If defendants were sincere in their professions, they would not charge the rotating heads, but would create a field adjacent to, or away from, the atomizing head.

■■ The inventive ideas of plaintiff have been appropriated; supplementation or modification, even if an improvement, will not avoid infringement, Specialty Equipment & Machinery Corp. v. Zell Motor Car Co., 4 Cir. 1952, 193 F.2d 515, 519; nor will an impairment, Weiss v. R. Hoe & Co., 2 Cir. 1940, 109 F.2d 722, 726; Matthews v. Allen, 4 Cir. 1950, 182 F.2d 824, 827–828; Eames v. Andrews, 1887, 122 U.S. 40, 70, 7 S.Ct. 1073, 30 L.Ed. 1064; Hoeltke v. C. M. Kemp, 4 Cir. 1936, 80 F.2d 912, 941. "If the infringing device performs the same function as the patented device, it is immaterial that it also performs some other function. It is still * * * an appropriation of the patented invention." Chesapeake & Ohio Ry. Co. v. Kaltenbach, 4 Cir. 1939, 95 F.2d 801, 804.

Defendants' Model 12 apparatus is not charged with infringing the '602 patent.

Defendants concede [67] that if the '602 is valid, their Model 50 apparatus would infringe. The court has found the '602 patent to be valid, and therefore finds it infringed by defendants' Model 50 apparatus.

Defendants deny that the M–50 dual disc apparatus infringes the '602 patent, because "[A]ll of the claims except claims 8, 9, 11 and 15 are specifically limited to looped, circular or arcuate conveyors." [68] (Note: the amended complaint alleges infringement of claims 1, 6–10, 12, 13, 15–21 so that the argument apparently concedes infringement of claims 8, 9 and 15). Defendants contend that the "two, straight-sided conveyors used in connection with the Model M–50 apparatus cannot conceivably infringe those claims." [69]

To refer to defendants' conveyor in connection with Ionic's M–50 apparatus as composed of "two, straight-sided conveyors" is misleading; they are two legs of a U-shaped conveyor. The conveyor show in Sedlacsik, Jr. Patent 2,894,-485 [70] are rectangles with rounded corners; the only places in which reference is made to the shape of the path to be traveled by the articles, refer to it as a "predetermined loop path" [71]; or "a U-shaped *portion* of a spray path" [72].

Moreover, the spray produced by the M–50 is annular, or radially expanding, as set forth in some of the claims of the '602 patent. The U-shaped loop retains most of the advantages of the circular loop. It uses beneficially the radially expanding spray, although perhaps not as efficiently as a truly circular loop. The court will not agree that a minor change in design, intended to take advantage of the inventive concept of the '602 patent, can avoid infringement, particularly when the change offers no justification other than an apparently conscious effort to depart from a true circle, and so avoid letter-perfect infringement.

The court finds that the M–50 apparatus infringes the '602 patent.

### Damages.

■ Plaintiff seeks treble damages under 35 U.S.C. § 284, and reasonable attorney's fees under 35 U.S.C. § 285. A strong case for such allowances is made out by the showing that Ionic, like its predecessor, was the jackal following the hunter; that before any accused devices were sold, the Sedlacsiks had knowledge of the '536 and '417 patents; that up to and into the trial they continued to give notice of additional prior art and

---

67. Defendants' Brief, page 78.

68. Ibid.

69. Ibid.

70. Figures 1 and 2.

71. Column 8, line 24; column 10, line 57; column 13, line 39.

72. Column 11, line 37; column 11, line 59, emphasis supplied.

alleged prior uses; that higher and higher head speeds were claimed as the defense to infringement developed; and that the defense that the paint does not have time to be charged on the head, was not developed, or at least disclosed, until the trial had begun.

In reply, defendants point out that when suit was begun, only the Starkey '536 and '417 and the Ransburg '472 patents had issued; that plaintiff dropped its charge of infringement of the Ransburg '472; and that after the Simmons '602 patent issued, Ionic ceased selling the Model 50.

The question is a close one, but the court does not feel that treble damages or attorneys' fees should be allowed.

▪▪▪ The court finds as facts, and rules as a matter of law, that:

1. Patents 2,685,536, 2,794,417, 2,893,-893, 2,893,894 and Re. 24,602, are valid.

2. Defendants have infringed claims 1–11 of 2,685,536; claims 3–4 of 2,794,-417; claims 1, 2, 3, 5, 6, 8–10 of 2,893,-893; claims 1–8 of 2,893,894; and claims 1, 6–10, 12, 13, 15–21 of Re. 24,602.

3. Defendants' counterclaims should be dismissed.

The foregoing opinion embodies the court's findings of fact and conclusions of law under F.R.Civ.P. 52(a), 28 U.S. C.A., whether or not so expressly characterized; and incorporates such portions of the proposed findings of fact and conclusions of law, submitted by the parties, as the court deems appropriate and necessary.

Let the parties submit an appropriate decree within ten days.

### APPENDIX A

August 3, 1954 W. A. Starkey, et al. 2,685,536.

Method for Electrostatically Coating Articles.

Filed September 29, 1944.

### Typical Claims

4. A method of electrostatically distributing liquid as a coating on an article, comprising the steps of supplying liquid coating material at a controlled rate to an atomizing zone located in spaced relation to the article, establishing said liquid as an electrode of an electrostatic field, atomizing finely divided discrete spray particles from the liquid at the atomizing zone, and dispersing such particles widely in at least two mutually perpendicular directions and depositing them still so dispersed and while still in liquid state as discrete spray particles on the article to form a finished coating thereon, the distance between the atomizing zone and the article being great enough to permit said dispersion of the particles as they proceed toward the article, the atmosphere in the region between the atomizing zone and the article being quiescent whereby electrostatic forces will be the predominant factor determining the paths respectively followed by the atomized particles as they move toward deposition, and moving said article relative to said atomizing zone so as to effect a substantial displacement of the article surface transverse to the general direction of the lines of force of the field during particle deposition to cause such lines of force to sweep such article surface.

\* \* \* \* \* \*

10. The method of electrostatically distributing liquid as a coating on an article, comprising the steps of moving the article past and in spaced relation to a zone of atomization, feeding liquid coating material in a relatively narrow stream, spreading said stream to form it into a body of liquid coating material having an extent many times the maximum cross-sectional dimension of said stream, maintaining at such zone of atomization the body of liquid coating material with said body having a plurality of closely spaced aligned exposed termini of relatively small area, establishing between the exposed termini of the coating material and the article moving past it an electrostatic field of sufficient strength that it both electrostatically atomizes small particles of coating material from such exposed termini and electrostatically deposits them still in the

form of discrete spray particles while still in liquid state for distribution into a continuous finished coating upon the article as it moves past the zone of atomization, and continuously and at a controlled rate maintaining said stream to supply coating material to said body to replace the coating material atomized therefrom by the action of the electrostatic field, said atomization and deposition both being effected in quiescent air, the direction of movement of said article relative to said body of coating material being such as to effect a substantial displacement of the article surface transverse to the general direction of the lines of force of the field during particle deposition to cause such lines of force to sweep such article surface, the spacing of said body of coating material from the article being great enough that the atomized particles will disperse under the action of the field as they move toward the article until they are distributed over and deposited onto a portion of the article surface having an area many times the area of the exposed termini.

June 4, 1957 W. A. Starkey, et al. 2,794,417.

Apparatus for Electrostatically Coating Articles.

Original filed September 29, 1944.

## Typical Claims

3. Apparatus for electrostatically coating an article with a liquid coating material, comprising a conveyor for moving the article over a predetermined path, a single-fluid atomizing head provided with a liquid supporting, flow-guiding surface having a terminus adjacent which liquid coating material is to be atomized, means for supplying liquid coating material at a controlled rate to said surface at a point spaced rearwardly from said terminus for flow as an exposed body over the surface to said terminus for atomization therefrom, and means including a high-voltage source having its opposite terminals electrically connected to the article on the conveyor and the liquid at said terminus for establishing an electrostatic field therebetween capable of atomizing the liquid from said exposed body at said terminus in the form of a spray and electrostatically depositing the spray on the article while still in liquid state, said head and conveyor being spaced apart by a distance great enough to permit the atomized liquid leaving said member to be widely dispersed.

4. Apparatus for electrostatically spray-coating an article, comprising an atomizing head, means for feeding liquid coating material to said head, means including said feeding means for distributing coating material to an extended atomizing zone where it is atomized from a plurality of spaced points, said points being sufficiently close together to permit the coating material to bridge the spaces therebetween, a support for supporting an article to be coated in spaced relation to said atomizing zone, and means including a high-voltage source for creating over the surface of the article on said support an electrostatic field capable of atomizing the coating material into finely divided, electrically charged particles and electrostatically depositing particles atomized from said atomizing zone on the article while still in liquid state, said atomizing head and support being so relatively disposed as to provide between the article and the atomizing zone a spacing great enough to permit substantial dispersion of the atomized particles by the electrostatic forces of the field.

July 7, 1959 W. W. Crouse, 2,893,893.

Method and Apparatus for Electrostatic Coating.

Filed January 31, 1950 [Continuation in part of abandoned application filed March 5, 1948].

## Typical Claims

2. A method of electrostatically distributing liquid as a coating on an article, comprising the steps of flowing a stream of liquid coating material from a supply orifice and positively deforming it into a thin film advanced without subdivision from the orifice to an atomizing zone to provide a thin film edge

substantially spaced from the article and having an extent many times its thickness, creating between said film edge and said article an electrostatic field of sufficient strength to form and affect the spacing of cusps at said edge and to electrostatically atomize finely divided discrete particles of liquid as a spray from the edge of said film at said zone, supplying said film with liquid at a controlled rate to replace that so atomized, and electrostatically dispersing said particles and depositing them still as discrete liquid spray particles on the article, the distance between the article and the atomizing zone being great enough to permit substantial dispersion of the liquid spray particles as they proceed toward the article, the atmosphere at the article being quiescent whereby electrostatic forces will effect deposition on the article of a substantial number of particles which otherwise would not have been deposited thereon.

\* \* \* \* \* \*

9. Apparatus for electrostatically spray coating the surface of an article with liquid atomized from an extended atomizing zone, comprising an atomizing head, means for delivering liquid coating material at a controlled rate from a source of supply to said head, said head including means for forming said liquid into a thin supported film and for providing said film with a substantially uniform leading edge extending along the atomizing zone, means for establishing between said film-edge and said article an electrostatic field of sufficient strength to draw the liquid of the film-edge beyond its support and form said film-edge into a series of spaced cusps, to electrostatically atomize said liquid from said cusps into a spray of finely divided discrete particles, and to disperse and deposit said particles on the article surface while still in liquid state, and means for positioning the article surface at a distance from the atomizing zone to permit substantial dispersion of liquid spray particles through a quiescent atmosphere as they proceed toward the article surface.

July 7, 1959 E. M. Ransburg, 2,893,894.

Method and Apparatus for Electrostatically Coating.

Original filed February 13, 1950 [Continuation of Serial No. 143,994, February 13, 1950].

## Typical Claims

1. In a method of electrostatically spray coating the surface of an article with liquid atomized from an annular atomizing zone, the steps of flowing liquid coating material at a controlled rate from a source of supply to a rotatable head, forming it into a thin film supported on said head and advancing said supported film toward said atomizing zone by rotating the head, said film having a uniform edge of an extent many times its thickness, establishing between said film-edge and said article an electrostatic field of sufficient strength to form said film-edge into a series of spaced cusps and to electrostatically atomize finely divided discrete particles of liquid as a spray from said cusps, and electrostatically dispersing and depositing said particles on the article surface while still in liquid state, said article surface being in a substantially quiescent atmosphere and at a distance from said atomizing zone sufficient to permit substantial dispersion of the liquid spray particles as they proceed toward the article.

\* \* \* \* \* \*

7. Apparatus for electrostatically spray coating the surface of an article with liquid atomized from an annular atomizing zone, comprising an atomizing head mounted for rotation about the axis of said atomizing zone, means for feeding liquid coating material at a controlled rate from a source of supply to said head, means for rotating said head, said head including means effective in rotation of the head for forming said liquid into a thin supported film and for providing said film with a substantially uniform leading edge at the atomizing zone, means for establishing between said film-edge and said article an electrostatic field of sufficient strength to draw the liquid of the film-edge beyond its

support and form said film-edge into a series of spaced cusps, to electrostatically atomize said liquid from said cusps into a spray of finely divided discrete particles, and to disperse and deposit said particles on the article surface while still in liquid state, and means for maintaining said article surface in a substantially quiescent atmosphere and at a distance from said atomizing zone sufficient to permit substantial dispersion of the liquid spray particles as they proceed toward the article.

February 17, 1959 C. C. Simmons, Re. 24,602.

Electrostatic Method and Apparatus For Spray Coating of Articles.

Original filed March 5, 1952.

### Typical Claims

8. Apparatus for electrostatically coating a plurality of articles comprising a rotatably mounted disk, means for supplying liquid coating material to the disk inwardly of the edge thereof, means for rotating the disk to move the material radially to an atomizing zone adjacent the edge of the disk for atomization and centrifugal projection from said atomizing zone in the form of finely divided particles, means for bodily transporting articles in path portions on opposite sides of the disk and in the plane thereof, and means for creating an electrostatic charge differential between the atomized particles and the article.

\*    \*    \*    \*    \*    \*

13. Apparatus for coating a plurality of articles from exteriorly thereof, comprising: a rotatably mounted atomizing device having a circular edge; means for supplying liquid coating material to a surface of the device; means for rotating the device to move the coating material fed thereto to the edge for atomization therefrom as a spray expanding radially from the axis of rotation of the device; a conveyor for bodily transporting said articles successively within the spray along a curved path concave toward said atomizing device and through at least a substantial portion of the spray; means for creating an electrostatic charge differential between the spray particles and the articles electrostatically to deposit the particles on the articles; and means for reciprocating the atomizing device parallel to its axis of rotation during the coating.

\*    \*    \*    \*    \*    \*

15. A method for providing a relatively wide coverage of an annular spray pattern in an electrostatic coating system, comprising: projecting spray particles radially in an expanding disc-like pattern; carrying articles to be coated in a path having portions on generally opposite sides of the axis of the pattern and in the plane of the spray particle projection; said path portions being of greater length than the transverse extent of the spray pattern; and creating an electrostatic charge differential between the spray particles and the articles electrostatically to deposit the particles on the articles.

\*    \*    \*    \*    \*    \*

20. A method for electrostatically spray coating a plurality of articles from exteriorly thereof comprising, providing an electrode, bodily and sequentially transporting articles in a looped path to simultaneously position a plurality of such articles around and substantially equidistant from said electrode, creating an electrostatic field extending between said electrode and said articles, and introducing atomized liquid coating material particles into said field for movement from adjacent said electrode to the articles to be electrostatically deposited thereon while maintaining the articles around said electrode, simultaneously to apply coating material to said articles.