**RANSBURG ELECTRO–COATING CORPORATION**

v.

**PROCTOR ELECTRIC COMPANY, Inc.**

and

**Ionic Electrostatic Corporation.**

**Civ. A. No. 10181.**

United States District Court
D. Maryland.

May 19, 1965.

G. C. A. Anderson, Anderson, Coe & King, Baltimore, Md., James P. Hume, Howard W. Clement and Verne A. Trask, Indianapolis, Ind., Byron, Hume, Groen & Clement, Chicago, Ill., for plaintiff.

Lawrence A. Kaufman, Cable & Mc-Daniel, Baltimore, Md., Edward F. Levy and Jesse Rothstein, Liberman & Levy, New York City, for defendants.

R. DORSEY WATKINS, District Judge.

Plaintiff has filed a petition to have defendant Ionic Electrostatic Corporation (hereinafter "defendant"; Proctor is not herein involved) adjudicated to be in contempt of an order passed by this court on May 7, 1962, and for an awarding of damages, including actual damages, expenses and attorney's fees, for such alleged contempt. Subsequently the petition was amended to request trebling of actual damages for alleged willful and wanton violation of the injunction. Defendant has responded, denying any violation of the injunction and claiming that all its conduct was in good faith, and at least part thereof taken upon advice of counsel.

Six days were spent in the hearing of testimony, and numerous exhibits were filed. Thereafter time was allowed for the filing of briefs, followed by a full day of oral argument.

### Background.

On March 15, 1962 this court rendered its opinion in Ransburg Electro-Coating Corporation v. Proctor Electric Company, Inc. and Ionic Electrostatic Corporation, D.Md.1962, 203 F.Supp. 235, affirmed 4 Cir. 1963, 317 F.2d 302, upholding the validity of the five patents of plaintiff in suit, and finding infringement by defendants of certain designated claims thereof. While a full understanding of the issues presently involved would certainly, if not requiring, be aided by, a reading and study of that opinion, it may suffice to say that the patents in question related to electrostatic spray-coating systems.[1] Early in the opinion the court referred to plaintiff's contentions, which it upheld, that the patents in suit disclosed methods and apparatus in which "the paint is made the electrode and electrostatically atomized, or that at least the paint is charged and atomized at the point of highest field intensity, is at the moment of atomization given a 'built-in' charge, and that the electrostatic field thereupon disperses the particles, and deposits them upon the work."[2] With respect to the scope of the patents, and infringement, defendants contended, but the court found to the contrary, that "the patents, if valid, are limited to those applications in which electrostatic forces are the *sole* source of atomization, dispersion and deposition. Otherwise stated, defendants claim that no infringement occurs if, specifically, centrifugal force plays *any* part, no matter how small, in either and/or atomization, dispersion or deposition."[3]

In connection with defendants' contention of file wrapper estoppel the court said:[4]

"The court is of the opinion that the minimum clearly allowable to plaintiffs as the result of the Patent Office prosecution is that plaintiff's patents cover any case in which the paint, as presented to the field (by gravity, or centrifugal force) is then atomized under circumstances in which electrostatic forces either predominate, or form a significant factor."

In its opinion, the court requested counsel to submit an appropriate decree. Drafts were presented by both sides. In addition to the normal differences in language of two persons expressing the the same general idea, there was a material difference in the substantive approach to the drafting of the injunctive provisions. Plaintiff in effect sought to embody by reference the patents in suit, and the court's opinion with respect thereto. Defendants insisted that under F.R.Civ.P. 65(d), the injunctive portion of the decree must "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained * * *". With this the court ultimately agreed.

Further difficulty was experienced in framing the language of the injunctive paragraph, in that all the devices currently used by plaintiff's licensees under the patents, and all the accused devices, used metal atomizing "heads" which were directly charged. Defendants sought to have the "process" portions of the injunction limited (among other things) to any process in which an electrical potential is created at the edge of the atomizing head by applying voltage "directly" to

---

1. Not limited to or even requiring, an electrostatic atomization of paint, as defendant herein urges; although such electrostatic atomization was in fact found to be present in the actual processes practiced by plaintiff, and in the accused devices.

2. 203 F.Supp. at page 238.

3. 203 F.Supp. at page 239. Italics in the original text.

4. 203 F.Supp. at page 251; see also page 253, last full paragraph.

said atomizing head. The court refused to embody this limitation.[5]

The resultant paragraph 19 of the decree reads as follows:

"19. Defendant, Ionic, including its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them, and each of them, is enjoined from:

"(a) Making, using or selling the apparatus described, respectively, in this cause as 'Model 12,' 'Model 50' and 'Model M–50,' or equivalents thereof, during the life of any of United States Letters Patent No. 2,-685,536, No. 2,794,417, No. 2,893,893 and No. 2,893,894, and making, using or selling the apparatus described, respectively, in this cause as 'Model 50' and 'Model M–50', or equivalents thereof, during the life of United States Letters Patent No. Re. 24,602.

"(b) Practicing the electrostatic spray coating process which is performed in the use of the apparatus described, respectively, in this cause as 'Model 12,' 'Model 50,' and 'Model M–50' or equivalents, including any process, (1) in which liquid coating material is advanced in a thin film to the edge of an atomizing head, an electrical potential is created at said edge by applying voltage to said atomizing head, said electrical potential being sufficient to create an electrostatic field between said atomizing head and the objects to be coated of sufficient strength to atomize, disperse and deposit the liquid coating material on the articles to be coated; or, (2) any process in which liquid coating material is advanced in a thin film to the edge of an atomizing head, an electrical potential is created at said edge by applying voltage to said atomizing head, said electrical potential being sufficient to create an electrostatic field between said atomizing head and the objects to be coated of sufficient strength to disperse and deposit the liquid coating material on articles to be coated and atomizing liquid coating material at the point of highest concentration of the lines of force in the electrostatic field, during the life of any United States Letters Patent No. 2,685,536, No. 2,794,417, No. 2,893,-893 and No. 2,893,894.

"(c) Actively inducing others to perform, or contributing to the performance by others of, any of the acts enjoined in subparagraphs (a) and (b) immediately above." [6]

The decree of the court, including the injunctive provisions of paragraph 19, was appealed and was affirmed in Ransburg Electro-Coating Corp. v. Proctor Electric Company, Inc. and Ionic Electrostatic Corporation, 4 Cir. 1963, 317 F.2d 302.

Defendant, while admitting that the provisions of the decree are binding, and that the question of validity, both of the patents in suit and of the injunctive provisions of the decree therein, may not be raised by collateral attack, does in substance question the propriety of the injunctive provisions, and, on the matter of damages, seeks to show that the ac-

5. Hearing of May 4, 1962, page 12. While reference to the head as being "charged" might be subject to improvement, neither side had any difficulty in understanding that in eliminating the word "directly" from the reference to the electrical potential created at the edge of the atomizing head, the court was including any method by which this could be effected—directly to a metallic head through a conducting shaft; by roller contact to an insulated head; by induction, or by prayer [antedating the School Prayer cases, but not

in conflict therewith, since no governmental agency, Federal, state or municipal, is directly or indirectly involved].

6. Paragraph (a) is not involved, except as the devices in question are "equivalents" of those of plaintiff. The emphasis herein has rather been upon the infringement of the process portions of paragraph (b), defendant conceding that the contributory infringement provisions of (c) would make it liable, if the accused processes fall within paragraph (b).

cused devices, if construed as contravening the court's decree, would fall within the prior art.[7]

### The Accused Processes.

In considering the processes employed by the accused devices, particular importance must be paid to at least two aspects of the language of Paragraph 19(b) of the decree. First, the process thereby enjoined is an "electrostatic spray coating process", not simply an electrostatic atomizing process. Secondly,[8] while (b)(1) relates to a process in which the electrical potential created at the atomizing head is sufficient to create an electrostatic field between the atomizing head and the objects to be coated of sufficient strength to "atomize, disperse and deposit" the liquid coating material, (b)(2) requires the field only to be of sufficient strength to disperse and deposit the liquid coating material, and that the liquid coating material be atomized [by any means] at the point of highest concentration of the lines of force in the electrostatic field.

The accused processes are practiced through the use of Ionic Model 10 hand gun, Ionic Model 25 and Ionic Model 30. Although a word description is necessary, diagrams of these three devices were introduced into evidence as Plaintiff's Exhibits 9, 7 and 8 respectively, and are attached as Appendix A. On the diagrams, the metal portions of the models are indicated by heavy oblique lines.[9]

In each of the devices the head is mounted on the metal shaft of a metal air motor which, with the head, is insulated from ground.[10] Either the metal motor, or some other metal element of each device is connected to the high-voltage source ("power pack"). In some instances this connection is established through an electrical resistance provided for safety purposes.

### Model 10.

This device is intended to be held in the hands of an operator during use. It has a tubular handle of insulating material, about two inches in diameter and three feet in length, at one end of which the atomizer is mounted. In some devices, the handle is straight, while in others it is bent adjacent the atomizer.

The handle completely houses the air motor, but the rotating head, which has a diameter of about 1 7/8 inches, projects from the end of the handle. The paint to be sprayed, and the air for operating the motor are supplied by passages extending through the long handle. A high voltage lead from the power pack also extends through the handle and has

7. Defendant has been as versatile in its shifting of counsel as it has been in its proliferation of processes. Original counsel were dropped for the appeal. Appeal counsel appeared in the first phases of the contempt proceedings but thereafter withdrew, whether voluntarily or by request is not known and in any event is immaterial. Their tenure was not of sufficient length or character for the court to have adequate opportunity to appraise them. The court does have great respect for original trial and present counsel for defendant, and for plaintiff's counsel, who have continued without change throughout all stages.

8. While the difference will be obvious to one who has closely followed the primary case, the gilding of the lily may be excused as to others, who may think of the lily primarily as a more expensive and less edible variety of the onion family.

9. On the diagram (Plaintiff's Exhibit 9) forming part of Appendix A, the head of the Model 10 is shown as metal. The current Model 10 is apparently furnished with a plastic head, although this is interchangeable with metal heads.

   The Model 25 has a metal head

   The Model 30 has a plastic head.

   The functional descriptive notations on the diagrams of the Models 25 and 30; e. g. "high voltage grid for charging mechanically pre-atomized * * * materials to facilitate electrostatic deposition," "point of highest field intensity" and "no contact with atomizer or paint supply" are defendant's self-serving characterizations and are not to be considered as factual.

10. The importance of this feature is later discussed.

its front end connected to the metal motor body through an electrical resistance.

In at least some early Model 10 devices, the cup-like head [11] was of metal and was directly connected to the high-voltage source through the motor shaft and the lead contained within the handle. The head was thus directly charged, and defendant does not seriously contend that this is not the equivalent of its old Model 12, and an infringement; and to the extent, if any,[12] to which sold after the decree, a contempt.

According to the Ionic instructional manual, the power pack supplied with the Model 10 has three output terminals respectively providing voltages of 15,100, 20,100, and 27,600.

### Model 25.

This model is adapted to be mounted on a stationary support for use in painting articles carried past it by a conveyor. The metal air motor, which is not enclosed, is mounted on the end of an elongated insulator, and the cup-like head is mounted in the forwardly projecting end of the motor-shaft. Behind the motor, the long insulator bears a forwardly flaring conical member of insulating material the rim of which is about five inches in diameter and laced with a fine wire, which is connected to the high-voltage source. The Model 25 is regularly sold with a metal head about 1¾ inches in diameter.

Defendant in its literature suggests that the head of the Model 25 may be spaced four inches from the work and that in most instances the potential applied to the wire lacing be 90,000 volts.

In defendant's Bulletin 100 relating to the Model 25 [13] it is stated that the required operational voltage "may be *induced* merely by an indirectly coupled electrostatic concentrator [presumably the wire lacing], or may be applied directly to the head of the atomizer." [Emphasis supplied].

### Model 30.

This device, like the Model 25, is intended to be mounted on a stationary support for use in coating articles conveyed past it. Further like the Model 25, its exposed metal air motor is mounted on an insulator. The Model 30 differs from the Model 25 in that the wire lacing is replaced with a head-surrounding, sharp-edged metal ring 14 inches in diameter located about 2¾ inches rearwardly of the head-rim and connected to the power pack. The head is of plastic and about three inches in diameter.

For the Model 30, defendant suggests that the spacing between head and work may be two inches and that in most instances the voltage applied to the ring be 90,000 volts.

### Discussion.

Plaintiff contends that all three of defendant's devices are, and employ processes that are, infringing. Defendant (except as to the Model 10 with a metal head) contends that none of the devices is, or employs a process which is, infringing, and that therefore there is no contempt. The impact of the provisions of Paragraphs 19(b) (1) and 19(b) (2) will have to be considered separately.

11. None of the accused devices has a flat disc head, such as was discussed in the principal case.

12. During the course of the contempt hearings, defendant's counsel undertook to supply the date upon which it was contended that sale of the Model 10 with a metal head was discontinued. This was not done.

There has been no testimony as to any effort by defendant to recall any of the metal-headed Model 10's sold before the decree, or to endeavor to require purchasers before the passage of the decree thereafter to remove the metal heads. For the reasons hereafter to be stated, the court does not mean to imply that substitution of plastic for metal heads would avoid infringement and/or contempt.

13. Plaintiff's Exhibit 50, page 5. Although it is stated that this is for "precipitation" only, it is the required operational voltage for the system.

Paragraph 19(b) (1) of the decree—
Field sufficient to atomize,
disperse and deposit.

Defendant seems to deny (1) the existence of a field between the head of the devices and the article to be painted; and (2) if there be such a field, that it is sufficient (a) to atomize the liquid coating material, or (b) to disperse it; and seems to aver (3) that deposition is not a true function of the potential existing at the various heads.

With respect to the application of the provisions of section (b) (1) of Paragraph 19 of the decree, the testimony ranged from the highly theoretical to the pragmatically practical.

On the theoretical side, defendant relied largely upon the testimony of its expert, Dr. Seville Chapman.[14] He had made extensive study of the "geometry" of fields, and had prepared two- and three-dimensional analogs of the "fields" associated with the accused devices, using metal heads [15] on all three. His starting point was that really there existed a universal field, and that this field was distorted by the introduction of "anything" into it; the distortion being greater in the case of the introduction of a man-made electrical "field" [16] within it.

As to the Model 25 and the Model 30, and conceding that for the purposes of the case it was satisfactory to speak of a "field" with respect thereto, he testified that the "field" was between the electrodes on those devices and the work; and that there was really no field between the atomizing heads and the work; although he recognized that in the case of metal heads they were charged simultaneously with the throwing of the switch creating the field between the electrodes and the work; and that with respect to plastic heads, they came to their field potential also simultaneously. In this concept, there were infinite lines of descending gradients between the electrodes (the highest potential, or 100) and the work (0); the atomizing heads, as any other intrusion into this field, being subjected to the gradient associated with its position between the electrodes and the work.

Dr. Chapman also recognized that in the ordinary (and practically, necessary) concept of the man-created field associated with electrostatic coating of materials, the "field" was created by all the elements present; a change in any, would affect the geometry of the field. Although there was one field "all over the place", one could focus on any particular part, and for convenience, or by way of shorthand, reference could be made to the "field" between the head and the work.[17] In this context, between the head and the work, the field at the head was at the highest intensity of anywhere in that area, location or dimension.[18]

Defendant's devices are designed to be, and in fact are, operated at high rotational speeds, in the order of 21,000 revolutions per minute. With the application of current to the metal head of the Model 10, or indirectly to the plastic head of a Model 10, the metal head of the Model 25, and the plastic head of the Model 30, at least five forces were operative, acting upon paint presented to the edge of any of the revolving heads. Of

14. Dr. Chapman impressed the court far more favorably than did defendant's experts in the main case, both as to competence and fairness. He frankly admitted, however, that he had had no practical experience, or even acquaintance, with commercial electrostatic spray coating. His highly involved, and theoretical, approach will become apparent in the course of this opinion.

15. He explained that it was impractical to use plastic heads in these studies. If the results be accepted as establishing the conclusions he sought to draw, his comment that (except in one instance) they would have been even less favorable to plaintiff if plastic heads could have been used, appears reasonable.

16. Or "sub-field"(?) or "sub-sub-field"(?), etc.

17. Transcript, page 1155.

18. Transcript, page 1153.

these, surface tension tended to maintain the integrity of the paint, and to keep it from disintegrating ("atomizing"), dispersing and depositing. Opposed to this were electrostatic, centrifugal, aerodynamic and gravitational forces. The paint therefore could not be broken into droplets until one or more of these opposing forces was sufficient to overcome surface tension. Of these opposing forces, the electrostatic force would tend to draw the paint into droplets, and to break them off from the body of the paint. As the electrostatic field is created between the head and the "work", the general tendency would be for the droplets so created to be directed toward the work; moreover, such atomizing force would impart an electrical charge to the droplet which would direct it toward the work (dispersion and deposition). Such force, whatever it be, would not be eliminated by the other existing forces.[19] Centrifugal forces would tend toward radial distribution of the formed drops, and the aerodynamic or "drag" forces would tend toward tangential dispersion. Gravity would be manifested in its ordinary connotation of attraction toward the center mass of the earth.

The asserted relationship of these forces was set forth in an exhibit prepared by Dr. Chapman, reproduced here as Appendix B, which was the subject of substantial direct and cross-examination and rebuttal testimony. Dr. Chapman at first took the position that these disruptive forces were "additive"[20], and specifically that this was true of the centrifugal and aerodynamic forces[21]. This was changed promptly to the statement that their relationship was that of "vectors", not arithmetical.[22] He was insistent that electrostatic forces could not be responsible for a "primary" drop[23] smaller than 25 mils.

With the greatest respect for the testimony of defendant's expert, the court cannot accept it, particularly as to his denial of the significance of the electrostatic forces.

1. Plaintiff's expert pointed out with irrefutable logic that

(a) As surface tension was the only force maintaining the integrity of the paint at the head of the atomizing device, *any* force exceeding surface tension would be sufficient to overcome surface tension; therefore there could be no cumulation.

(b) Electrostatic forces in fact produced droplets finer than 25 mils.

(c) Since neither aerodynamic or centrifugal forces alone would be able to overcome the surface tension associated with the formation of drops of $9/10$ mils (Appendix B) none should be formed, but Dr. Chapman testified that with the aerodynamic and centrifugal forces available, something under ten per cent of the drops produced would be as large as 4 mils.[24] The physical demonstrations showed the falsity of this assumption.

19. Transcript, page 1153.

20. Transcript, page 1069.

21. Transcript, page 1128.

22. Transcript, page 1129.

23. Although Dr. Chapman frequently referred to the "primary" drop formed by electrostatic atomization, through the pinching off of the "Mae West" waist, followed by "secondary" droplets, he never amplified this. The inference that the court obtained was that a number or series of such secondary drops could be formed, and that they were smaller than the primary drops. If the primary drops were electrostatically formed, and if the secondary drops were the sequelae, they likewise would appear necessarily also to be electrostatically formed. Whether they would likewise carry a "built-in" charge was nowhere directly discussed by parties or witnesses; although the fair implication is that, as plaintiff contended, that as all atomization was electrostatic in nature, or that at least electrostatic forces played a significant part, these succeeding (or secondary) particles would likewise carry built-in charges.

24. Transcript, page 1134.

2. Dr. Chapman admitted that his exhibit (Appendix B) had a margin of error of ½ pi-2-pi.[25]

3. The physical exhibits ("zip strips") clearly demonstrated the difference in size of drops, at high rotational speeds, with the field off and with the field on, the drops being smaller in the latter case.

4. Plaintiff's exhibits adequately established that the fields variously present between the heads of the painting devices and the work were adequate electrostatically to atomize paint at 0 revolution per minute. As rotation does not eliminate the electrostatic forces, and as surface tension was the only force maintaining the integrity of the paint, the electrostatic force of itself would continue adequate for atomization at least in the range down to below 10 mils and below that point would assist in "softening up" the paint to be, or where acted upon by, another force or forces. In any case the electrostatic forces either were of sufficient strength to atomize, or predominated, or formed a significant factor in the process.

The court therefore finds that on the preponderance of the evidence, the electrical potential at the edge of the atomizing head is sufficient to create an electrostatic field between the atomizing head and the objects to be coated of sufficient strength to atomize the paint. As the court also finds in the following section that the electrical potential is sufficient to create an electrostatic field between the atomizing head and the work of sufficient strength to disperse and deposit the paint, a fortiori these provisions of Paragraph 19(b) (1) of the decree are met.

Paragraph 19(b) (2) of the decree— Field sufficient to disperse and deposit; atomization occurring at the point of highest concentration of the lines of force in the electrostatic field.

These factors may conveniently be considered in reverse order:

(1) "atomizing liquid coating material at the point of highest concentration of the lines of force in the electrostatic field * * *." There is no dispute but that atomization, however produced, occurs at (or immediately adjacent to) [26] the edge or rim of the head. Also, there is no dispute that the highest concentration of lines of force, between the head and the work, is at the head. The dispute as argued by the parties, is as to whether there is a "field" between the head and the work, or whether the "field" to which reference is made in the above quotation is the field between the electrode and the work. The court is clearly of the opinion, and finds, that within the language of Paragraph 19(b) (2) of the injunctive decree, there is a "field" between the atomizing head and the work, and that the highest concentration of lines of force within this field is at the atomizing head, where atomization occurs.

A number of considerations lead to this finding:

1. The main argument made by defendant is that the field must exist between (a) the forward edge of the motor, in the Model 10 with a plastic head; (b) the wire lacing of the Model 25; (c) the metal ring of the Model 30—and the work. This has in part been dealt with in connection with section (b) (1) of Paragraph 19 of the decree, where it was pointed out that for convenience or by way of shorthand, one could refer to the "field" between the head and the work. This seems almost inevitable, be-

25. A 400 per cent (1.57 to 6.28) margin of error; many times that permitted of District Judges.

It would perhaps not be amiss here to dispose of the battle of similes. Dr. Chapman asserted that the atomization significance of the electrostatic field at 21,000 r. p. m. was equivalent to the squashing effect of the feather in the cap of an elephant when it stepped on a hen egg. Plaintiff responded with the story of the physicist who "conclusively" proved that the anatomy of the bumble bee would not permit it to fly.

26. Under any theory, the drops are formed as the paint leaves the head.

cause, on the "universal field" approach, there would be no "field" between any electrode and any work, but only a distortion of the universal field. So the electrode, the line transformer, the power house generator, the earth, moon, sun and stars are significant only as distortions in or of this universal field.

The fact that metal atomizing heads are charged and plastic heads come to their field potential, simultaneously with the energizing of the electrode (as established by all the evidence, and as manifested by the necessity that the head be insulated from ground—see footnote 10 and text), and that the paint contacts the heads and not the electrodes, certainly justifies considering the gradient potential between the head and the work as *a* field.

Moreover, the context in which the word "field" is used in section (b) (2) of Paragraph 19 of the decree practically requires this construction. That section refers to an electrical potential applied to the edge of an atomizing head, said electrical potential being sufficient to create "an electrostatic field" between the head and the work of sufficient strength to disperse and deposit liquid coating material, and "atomizing liquid coating material at the point of highest concentration of the lines of force in *the* electrostatic field * * *" (Emphasis supplied). "*The* electrostatic field" is clearly the only electrostatic field previously mentioned—the one between the head and the work.

2. As mentioned above, defendant's Bulletin 100 relating to the Model 25, states that the required operational voltage "may be induced merely by an indirectly coupled electrostatic concentrator, or may be applied directly to the head of the atomizer." Aside from an apparent concession of equivalence, which would be a direct violation of the injunction, this language [27] must mean that there is a field between the atomiz-

ing head and the work; otherwise, the Model 25 would be inoperative as would be the Model 10, particularly with the metal head.

3. While a concession, or even a direct assertion, by a party on another occasion cannot make true that which in fact is false, it is significant as to that party's understanding. When an assertion is made to secure the issuance of a patent, and denied when the party is being sued for infringement of another patent, perhaps the highest degree of significance is reached.

Defendant's president is the patentee of United States Patent 3,051,394 for "Electrostatic Spray Coating Apparatus and Method," issued on August 28, 1962, on a division of an application filed December 1, 1955.

The specification refers to a spray or atomizing gun surrounded by a discharge electrode.

"Here, there is no direct contact between the discharge electrode and the head end of the spray gun, the head end being charged by induction." [28]

*    *    *    *    *    *

"In this invention, a source of electrostatic high potential, having one terminal grounded and its opposite terminal surrounding the atomizing head, *creates a strong electrostatic field at the head by means of induction. The field extends between the head and the article to be coated,* the article being grounded. The force of this field transforms the atomized coating material into a spray of charged particles and creates an attraction which pulls the spray toward the grounded article." [29]

The specification further recites that the discharge electrode "may be adjusted forwardly and rearwardly relative to the head end of the gun in order to vary

27. Significant also on the question of the measure of damages.

28. Column 2, lines 59–62.

29. Column 3, lines 54–62; emphasis supplied.

the degree of induction at the head end of the gun * * * " [30]

In United States Patent 3,001,890 to defendant's president, for "Electrostatic Deposition," issued September 26, 1961 on application filed July 27, 1956, in the more particularly described process the high voltage source is led to the head end of a spray gun and to an insulated rotating disc "so as to raise same to a sufficiently high potential to charge the liquid supplied thereto and discharged therefrom." [31]

"Also, if desired, the spray gun may be grounded and the high voltage may be applied directly to a grid ring or any shape of electrode which is disposed so as to charge the disc which is insulated. In this instance, the disc will also be a high potential due to the capacity effect between the grid ring or electrode and the disc itself." [32]

In another arrangement of electrical circuitry in which a high voltage source is connected to charge the nozzle and the disc, or at any time when the disc *"is charged either directly or indirectly"* and the work is grounded directly or indirectly, it is stated that "there is an electrostatic field between the atomizer and the object * * * " [33]

This leaves for consideration the question of whether the field between the head and the work is sufficient (a) to disperse and (b) to deposit, the paint.

It is quite clear that if the formed particles acquire a charge at formation, or later acquire a charge in space, the charge is similar (positive or negative in each case), and as like charges tend to repel, the necessary effect is to cause a separation, or dispersal. In fact Dr. Chapman, in criticizing the testimony on behalf of plaintiff that when the field was on, the spot sizes deposited tended to be smaller than when the field was

off (plaintiff plausibly contending that the particles were originally smaller in size because of electrostatic atomization, or because of the effect of electrostatic forces) explained that with the field on, the larger spots [34] tended to repel, rather than agglomerate with, the smaller spots.

The court has never had explained to it how paint particles, similarly, and so charged, that they were attracted to the work, can fail to exhibit both repulsion and dispersion. It is true that with regard to the work, the dispersion which would be effected by purely centrifugal or aerodynamic atomization would be far wider than that associated with electrostatic atomization. With purely centrifugal or aerodynamic atomization, the amount of paint deposited therefore would be nominal. But in electrostatic atomization, there is both the attraction of each particle toward the work, and a repulsion against coalescence, which represent the optimum attainable.

If the contention that the paint particles acquired their charge (presumably by ion bombardment) only after formation, were sound, elimination of the "field" between the head and the work, while preserving the "field" between electrode and work, should not reduce the efficiency of deposition; while elimination of the ion bombardment "field" between the electrode and the work, while maintaining the "field" (which would then uncontrovertably be a "field") between the head and the work, should materially reduce that efficiency. Actual tests [35] showed the contrary.

Eliminating the "field" between head and work by grounding the motor reduced the deposition efficiency by over 80 per cent in the case of metal heads and by over 70 per cent in the case of plastic heads. Eliminating the ion bombardment "field" did not lower deposi-

---

30. Column 6, lines 9–11.

31. Column 3, lines 38–40.

32. Column 3, line 74; column 4, line 4.

33. Column 4, lines 12–16; emphasis supplied.

34. Again indicating the unreliability of Appendix B, in that it represented at best a tendency, as distinguished from an accurate determination, or even a reliable forecast. See footnote 23, and associated text.

35. Plaintiff's exhibit 44.

tion efficiency, but if anything slightly increased it.

■ These data, along with the specifications in United States Patents Nos. 3,051,394 and 3,001,890, supra, clearly establish, and the court finds, that in the accused devices, whether with metal or plastic heads, the potential thereto applied is sufficient to create an electrostatic field between the atomizing head and the work of sufficient strength to disperse and deposit the paint on the work, and that the paint is atomized at the point of highest concentration of the lines of force in the electrostatic field, and that the injunctive provisions of section (b) (2) of Paragraph 19 of the decree have been violated.[36]

By way perhaps of overcaution, but as emphasis, the court points out that defendant admits that Model 10 with a metal head is an infringement; and defendant's operational bulletin with respect to Model 25 establishes that it is a process equivalent to those of plaintiff held valid in the original case.

Judgment will accordingly be entered in favor of plaintiff on its motion for contempt of the court's decree herein.

### Damages.

■ In the original case, the court found that a strong case had been made for the allowance of treble damages under 35 U.S.C. § 284, and reasonable attorney's fees under 35 U.S.C. § 285, and that the question was a close one, but in its discretion denied such allowance.[37] While, as indicated, the court in general is not inclined to award what are, in patent cases, in the nature of punitive damages, it feels that the facts in this case call, if indeed they do not cry, for such allowance.

The Model 10 with a metal head is an admitted infringement.

The starting point for the remaining accused devices is the court's admonition in the previous case that an appropriation of a patentee's idea is an infringement, even if the accused device is an impairment of the invention.[38]

In this case there has been a further studied effort to appropriate plaintiff's invention but to avoid literal infringement by a deliberate degradation. As frankly stated:

"The head of the centrifugal atomizer is the most convenient and practical member to use as the charging electrode to create an electrostatic field for depositing paint because the field created begins and ends at the head and work respectively and is strongest for the amount of voltage applied and therefore most efficient. The head was thus charged in the Models 12, 50 and M-50 devices, but this unfortunately was held to constitute an infringement at the trial.

"To place the centrifugal atomizer head elsewhere with relation to the field presents a problem because it decreases the efficiency of the electrostatic system * * *"[39]

Moreover, defendant has deliberately sought to postpone the evil day of reckon-

---

36. Defendant was permitted to offer what it claimed to be prior art patents after an express disclaimer that there was any purpose to invalidate the patents in suit, but only to "limit the possible interpretation which may be given to the claims or the language of the injunction * * *" (Transcript, page 1319). Much of this prior art had been expressly considered in the main case and rejected as non-anticipatory, and the balance is no more pertinent. The finding that the accused devices and processes violate the injunction is the equivalent of a finding of infringement; and if they infringe, they cannot be following the non-anticipatory prior art, for "that which infringes, if later, would anticipate, if earlier." (Marshall v. Procter & Gamble Mfg. Co., D.Md.1962, 210 F.Supp. 619, 633, citing Peters v. Active Mfg. Co., 1889, 129 U.S. 530, 537, 9 S.Ct. 389, 392, 32 L.Ed. 738).

37. 203 F.Supp. at pages 258–259.

38. 203 F.Supp. at page 258; and cases cited.

39. Defendant's brief, page 11.

ing. Defendant's original trial counsel expressed a desire to have the new devices promptly presented to this court for determination as to infringement, vel non, and violation of the injunction. This was seriously impeded by defendant, which used a change of counsel, and then the withdrawal of discretion on the part of such counsel, particularly with respect to making the accused devices available, directly by purchase by plaintiff, or indirectly through examination at the premises of purchasers from defendant, as a delaying device, as an obstacle.

As to the contention that there was no field between the atomizing heads and the work, and that the charge, if any, on the heads, was insufficient not only for atomization, but for dispersion and/or deposition, patents Nos. 3,001,890 and 3,051,394 to defendant's president have previously been cited. While it is true that these do not establish the factual accuracy of the disclosures therein, they clearly establish that defendant could not have believed, at the time of the development of the accused devices, that they differed from plaintiff's devices as contended in the contempt proceedings—particularly as to any question as to the existence of a charge on the atomizing head; as to the existence of a field between the head and the work; and as to the contention that the atomized paint received its charge only between the head and the work.

■ Finally, defendant's contention that it relied upon the advice of counsel,

instead of showing its good faith, is under the facts a further instance of double dealing.[40]

Here, defendant purportedly sought the advice of one counsel as to the Model 30 and another as to the Model 25.[41]

In connection with the rendition of such opinions, it was represented with respect to the Model 30 that "only the large remote grid ring was charged"[42] and that as to the Model 25 that the charge was "carried only to the sharp * * * to the sharp edged remote grid";[43] and in each case the attorney was told that the coating material was "mechanically" atomized or pre-atomized. It should also be noted that the opinion with respect to the Model 25 was obtained five days before the decree herein in which the court refused to limit the injunction to heads directly charged.

Moreover, the opinions were not sought as to the validity of devices (or processes) to be put upon the market, but only after they had been marketed.

Plaintiff is accordingly entitled to (i) a judgment that defendant is in contempt of sections (b) (1) and (b) (2) of Paragraph 19 of the decree; (ii) damages for the infringement of plaintiff's patents, which damages will be trebled under 35 U.S.C. § 284; and (iii) reasonable attorney's fees under 35 U.S.C. § 285. The parties are directed to submit within ten days a decree satisfactory as to form, or if they are unable to do so, to submit proposed forms of decrees.

---

40. The court does not mean to intimate that there is any impropriety in seeking, and relying upon, the advice of counsel, in an effort to be forehanded if any charge of wilful infringement is later made. But the court considers that there is a close analogy between the rules applicable to such cases, and those in which the advice of counsel is relied upon as a defense to an action for malicious prosecution. In the latter, there must be a full and frank disclosure to counsel of all facts that the client knows, or by reasonable diligence could discover; and the advice of counsel must have been sought with the intent of relying upon it.

41. Defendant's exhibits 30, 31.

42. Transcript, page 1311.

43. Transcript, page 1313.

40

■■■■■■■■

APPENDIX A

IONIC MODEL 10 HAND GUN

PLAINTIFF'S EXHIBIT NO. 9 (continued)

CASE NO. 10181

ADMITTED IN EVIDENCE

SEP 11 1963

MOUNTING PLATE

ATOMIZER HEAD

AIR TURBINE MOTOR

TURBINE SUPPORT PLATE

AIR INLET FOR TURBINE AND
HIGH VOLTAGE CONNECTION

AIR LINE

COATING MATERIAL FEED LINE

RESISTOR

AIR LINE AND
HIGH VOLTAGE CONNECTION

HIGH VOLTAGE LEAD

REAR CAP FOR TURBINE
AND AIR INLET

PLASTIC HAND GUN SUPPORT TUBE

PLASTIC SCREW

PLASTIC GROOVED NOSE PORTION

PLASTIC NUT

PLAINTIFF'S EXHIBIT NO. 7 (Pintsomf)

CASE NO. 10181

ADMITTED IN EVIDENCE SEP 11 1963

IONIC® M-25

IONIC® M-30

## APPENDIX B

## FORCES ON PAINT AT EDGE OF ROTATING DISC

The following formulas represent the forces acting on a droplet about the time it is "atomized". I give results in terms of *force per unit weight* (F/mg) for the droplet to facilitate comparison. I have arbitrarily called drops large, medium, medium small and small. I have arbitrarily chosen certain parameters as indicated.

$f$ = 350 revolutions/second = 21,000 revolutions/minute

$R$ = radius of disc = 4 cm $\cong$ 1.6 inch

$v$ = $2\pi f R$ = 8,800 cm/sec

$s$ = density of paint = 1 gram/cm$^3$ (approximate)

$D$ = density of air = 0.0012 gram/cm$^3$

$T$ = surface tension of paint = 25 dynes/cm (approximate)

$E_{max}$ = sparking field = 30,000 volts/cm (maximum)

$g$ = acceleration of gravity = 32 ft/sec$^2$ = 9.8 meters/sec$^2$

$r$ = radius of droplet

$C_D$ = drag coefficient $\cong$ 0.5 for big and medium droplets $\cong$ 1.0 for small

$e_O$ = permittivity of space = 8.854 x 10$^{-12}$ farad/meter

**FORCE PER UNIT WEIGHT     F/mg**

| | Large $r = 0.1$ cm $= 80$ mils dia. | Medium $r = 0.01$ cm $= 8$ mils dia. | Medium Small $r = 0.005$ cm $= 4$ mils dia. | Small $r = 0.001$ cm $= .8$ mils dia. |
|---|---|---|---|---|
| Surface Tension Force Required per unit weight $\dfrac{3T}{2r^2 s g}$ | 3.8 | 380 | 1520 | 38,000 |
| Gravity    1 | 1 | 1 | 1 | 1 |
| Electrostatic $\dfrac{3 e_O (E_{max})^2}{2 r s g}$ | 12 | 120 | 240 | 1,200 |
| Aerodynamic $\dfrac{3 C_D D v^2}{8 r s g}$ | 180 | 1,800 | 4,300 | 36,000 |
| Centrifugal   $v^2/Rg$ | 20,000 | 20,000 | 20,000 | 20,000 |

Seville Chapman    Oct. 1, 1963

DEFENDANT'S CONTEMPT EXHIBIT NO. <u>24</u>

CASE NO. <u>10181</u>

ADMITTED IN EVIDENCE   OCT 16 1963