RANSBURG ELECTRO–COATING COR-
PORATION, Plaintiff-Counter
Defendant,

v.

SPILLER AND SPILLER, INC., Defend-
ant-Counter Claimant, Third-Party
Plaintiff,

v.

IONIC ELECTROSTATIC CORPORA-
TION, Third-Party Defendant.

No. 70–C–108.

United States District Court,
N. D. Illinois, E. D.

April 3, 1972.

See also 4 Cir., 431 F.2d 947.

David J. Gibbons, Chadwell, Keck, Kayser & Ruggles, Clyde F. Willian, Hume, Clement, Hume, & Lee, Ltd., Chicago, Ill., for Ransburg Electro-Coating Corp., the plaintiff-counter-defendant.

Robert N. Caffarelli, Caffarelli & Wiczer, Robert E. Wagner, Walsh, Case & Coale, Chicago, Ill., for Spiller and Spiller, Inc., defendant-counter-plaintiff and third party plaintiff.

Myron C. Cass, Silverman & Cass, Chicago, Ill., for Ionic Electrostatic Corp., third party defendant.

## MEMORANDUM, ORDER AND JUDGMENT

WILLIAM J. CAMPBELL, Senior District Judge.

This is an action on an agreement executed in settlement of a 1965 patent infringement suit between the plaintiff Ransburg Electro-Coating Corporation (hereafter "Ransburg") and Spiller and Spiller, Inc. (hereafter "Spiller"), the defendant in the prior action. Ransburg's complaint in the present action seeks to enforce the terms of a portion of the 1965 settlement agreement. Spiller through its supplemental answer has denied liability on the theory, *inter alia,* that the enforcement of the settlement agreement set forth in the plaintiff's complaint would contravene the public policy expressed in the federal patent laws since such enforcement, it is claimed, would allow the plaintiff to collect royalties on patents which have been judicially determined not to encompass the devices owned by the defendant. For this reason the defendant Spiller requests that the entire 1965 settlement agreement be declared unenforceable. Additionally, Spiller requests that all payments previously made pursuant to the terms of the settlement be ordered refunded. Finally, Spiller has also filed a third party action against the Ionic Electrostatic Corporation (hereafter Ionic), the manufacturer of the electrostatic spray painting systems which are involved in this litigation. The third party action alleges that if Spiller is unable to recover the monies previously paid to Ransburg and is further liable for additional royalties, then Ionic is liable to Spiller for all sums it has paid and to be paid to Ransburg for use of Ionic's spray painting systems.

Because of the complicated nature of the issues involved here and of the arguments advanced by the parties in support of their respective motions for summary judgment, some explanation of the history of this law suit and certain related litigation is necessary. At all pertinent times Ransburg was engaged in the business of manufacturing and marketing electrostatic spray painting systems and apparatus and owns a number of basic patents in the field. On November 21, 1957, Ransburg commenced a patent infringement suit against the Procter Electric Company in the United States District Court for the District of Maryland. Ionic voluntarily entered that law suit as a defendant, answered the complaint and conducted the defense for both defendants. In that case, the district court determined that certain patents of Ransburg were valid and that the use of the Ionic Model 50 Electrostatic Sprayer by Procter and its sale by Ionic constituted an infringement of those patents. Ransburg Electro-Coating Corporation v. Procter Electric Company, 203 F.Supp. 235 (D.Md.1962). The decision of the district court was affirmed by the Court of Appeals for the Fourth Circuit on May 14, 1963. Ransburg Electro-Coating Corporation v. Procter Electric Company, 317 F.2d 302 (4th Cir.1963). Following the district court's decision, but prior to the decision of the Court of Appeals, Ionic marketed a new electrostatic sprayer known as the Ionic Model 25 Electrostatic Sprayer. Subsequent to the decision of the Court of Appeals for the Fourth Circuit on the Ionic Model 50, Ransburg brought a contempt action against Ionic in the Mary-

land District Court, charging that the sale and use of the Ionic Model 25 violated an injunction which had previously been entered by the Court in the Ionic Model 50 case. In the contempt action the district court held that the manufacture and sale of the Ionic Model 25 infringed the Ransburg patents and thus violated the earlier injunction. Ionic was found to be in contempt and treble damages and attorneys' fees were assessed against it. Ransburg Electro-Coating Corporation v. Procter Electric Company, 242 F.Supp. 28 (D.Md., 1965). Ionic again appealed and on April 11, 1968 the Court of Appeals reversed the district court, holding that the Ionic Model 25 Electrostatic Sprayer did not infringe any of Ransburg's patents. Ransburg Electro-Coating Corporation v. Ionic Electrostatic Corporation, 395 F.2d 92 (4th Cir., 1968). The basis of the Appeals Court's lengthy and thoughtful opinion is succinctly stated in its opening paragraph. The Court remarked "In light of the prior art, which the patentee has no right to appropriate, we think the finding [of the district court] erroneous." 395 F.2d at 93. In effect the Fourth Circuit Court of Appeals found that to construe the Ransburg patents in such a manner as to encompass the Ionic Model 25 would make them read on the prior art, thus rendering them prima facie invalid.

While the Maryland litigation was proceeding Ransburg was also active in this District. In 1959 Spiller had purchased an Ionic Model 50 Electrostatic Sprayer. When the Model 50 was destroyed in early 1962, Spiller immediately purchased an Ionic Model 25 which it has been using on its premises since that time. Ransburg was aware of Spiller's use of both the Model 50 and the Model 25 and after attempts to reach an out of court settlement with Spiller were unsuccessful a patent infringement suit was filed by Ransburg against Spiller in this Court. Ransburg

Electro-Coating Corporation v. Clifford Spiller and Spiller and Spiller, Inc., 65 C. 641 (N.D.Ill., 1965). On November 12, 1965 that case was dismissed pursuant to a settlement agreement signed by both Ransburg and Spiller. Formally, the suit was dismissed by the plaintiff without prejudice pursuant to Rule 41(a) (1), F.R.Civ.Proc.

The settlement agreement signed by the parties contained two essential provisions. The first provided that Spiller would pay Ransburg the sum of $70,000 in sixty monthly installments as compensation to Ransburg for infringement of specified Ransburg patents as a result of Spiller's use of the Ionic Model 50 and the Ionic Model 25 equipment prior to the time of the settlement.[1] The second portion of the agreement consisted of a standard patent license under which Spiller was granted a license upon Ransburg's customary terms and conditions to use the Ionic Model 25 apparatus free of any claim of infringement.

With respect to the outright patent license granted in the second part of the settlement agreement, payments in the amount of $10,679.34 were made thereunder by Spiller until approximately May, 1966 after which no further payments were made. Payments, the precise amount of which is disputed by the parties, on the settlement agreement as it relates to prior infringement were made by Spiller until July, 1968, but no payments have been made since that time.

As I have previously observed this action was filed on January 16, 1970 by Ransburg to recover the amounts due under the portion of the agreement relating to past infringement. Spiller contends that federal patent policy bars the enforcement of the entire agreement and entitles it to a refund of all amounts previously paid to Ransburg. Both parties have filed motions for summary judgment supported by numerous affida-

---

1. The patents specified in the agreement, United States Patent Nos. 2,685,536, 2,794,417, 2,893,893, 2,893,894 and R.E. 24,602, were the same patents as those involved in the Maryland litigation.

vits and exhibits. Although similar motions were denied by this court on November 2, 1970, the renewal of these motions by the parties persuades me that no genuine issue of material fact is presented in this case and that therefore disposition by summary judgment is proper. The facts as set forth above are those which I find to be material to the disposition of this cause. I further find, with one unimportant exception,[2] that none of these facts are even remotely contested by any of the parties. There being no issue for submission to a trier of fact, use of the summary judgment procedure authorized by Rule 56, (F.R.Civ.Proc.) is entirely proper. Kirk v. Home Indemnity Company, 431 F.2d 554 (7th Cir. 1970).

In varying degrees both Ransburg and Spiller have phrased the issues incorrectly. Ransburg suggests that the ultimate question is whether one of the parties can unilaterally rescind a settlement agreement after an arms-length negotiation of the agreement in the context of a patent infringement suit with the dismissal of the suit as the consideration for that agreement. No one disagrees with Ransburg's general propositions that the compromise of a bona fide claim is well recognized as a valid consideration, Galion Iron Works & Mfg. Co. v. J. D. Adams Manufacturing Co., 105 F.2d 943, 946 (7th Cir. 1939); Koelmel v. Kaelin, 374 Ill. 204, 210, 29 N.E.2d 106, 109 (1940), and that settlement agreements are highly favored by the courts, Williams v. First National Bank, 216 U.S. 582, 595, 30 S.Ct. 441, 54 L.Ed. 625 (1910). Nor do I quarrel with the general rule that a party may not avoid the impact of a settlement agreement where subsequent events have somehow vitiated or invalidated the consideration for that agreement. See Koelmel v. Kaelin, supra at 109. The problem with Ransburg's argument is that it does not address itself to the real

issues in this case. This case cannot be disposed of by reference to principles of contract law alone. Ransburg's continued refusal to recognize the underlying federal patent policies involved in this litigation has prevented it from fully confronting the controlling issues in this case. Ransburg argues that the settlement agreement is merely a contract and should therefore be governed only by general principles of contract law. This thesis completely ignores the substance of the particular contract involved. This contract, including both of its parts, essentially calls for the payment of royalties by Spiller for its past and future use of two pieces of electrostatic paint spraying equipment which purportedly infringed on certain specified patents of Ransburg. Although executed in the context of a law suit, the agreement is nothing more than a patent licensing contract.

Spiller too has miscast its argument although in lesser degree than Ransburg. It submits that either because Ransburg's patents are invalid or because Spiller's Ionic Model 25 did not infringe upon any of Ransburg's valid patents, the consideration for the 1965 settlement agreement has been vitiated and that, therefore, the agreement is unenforceable. For this proposition Spiller principally relies on the decision of the Supreme Court in Lear v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610. In Lear, the Supreme Court held that a licensee under an otherwise valid royalty contract is not estopped from challenging the validity of the patents which are the subject of the contract. The holding of Lear is based on more than simply a lack of consideration due to the later determined invalidity of the underlying patents. Rather, Lear teaches that even though a royalty contract is supported by adequate consideration in the traditional contract law sense, the technical requirements of contract doctrine must

---

**2.** The apparent dispute over the amounts previously paid under the license agreement portion of the settlement contract need not be resolved. My ultimate resolution of the issues in this case makes this question irrelevant.

give way before the strong federal policy that a licensor may not demand royalties for the use of an idea which is in reality part of the public domain. See Lear v. Adkins, 395 U.S. 653, 668–672, 89 S.Ct. 1902, 23 L.Ed.2d 610; Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 342–345, 91 S.Ct. 1434, 28 L.Ed.2d 788; see also, Sears, Roebuck v. Stiffel Company, 376 U.S. 225, 84 S.Ct. 784, 11 L. Ed.2d 661 and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S. Ct. 779, 11 L.Ed.2d 669.

Other courts have adopted a similar reading of *Lear*. For example, in Product Engineering and Manufacturing Inc. v. Barnes, 424 F.2d 42, 44 (10th Cir. 1970) the court announced in dictum that after *Lear* "there would seem to be no doubt about the right of a licensee to raise the issue of the validity and noninfringement of a patent as a defense in a State action to enforce payment of royalties." Thus the Court of Appeals for the Tenth Circuit recognized that the requirements of federal patent law must be complied with before a patent licensing agreement may be enforced. Perhaps even more applicable to the case before me is the decision of the Court of Appeals for the Ninth Circuit in Massillon-Cleveland-Akron Sign Company v. Golden State Advertising Company, 444 F.2d 425, 427 (9th Cir. 1971). In that case, as in this case, a covenant to pay patent royalties was incorporated into a settlement agreement as distinguished from a typical patent licensing contract. There, as here, the court was asked to hold *Lear* inapplicable to royalty contracts which take the form of settlement agreements. The argument was premised on the strong policy in favor of the settlement of legal disputes. The Court responded that "if the recognized policy favoring settlement of disputes might be hindered by our holding on this question, that policy, in our opinion, must give way to the policy favoring free competition in ideas not meriting patent protection." 444 F.2d at 427. Finally, our own Court of Appeals for the Seventh Circuit has expressed a similar understanding of *Lear*. In Business Forms Finishing Service Inc. v. Carson, 452 F.2d 70 (7th Cir. 1971) the defendants agreed to recognize the validity of the plaintiff's patent in order to settle a prior patent infringement suit. When the second litigation was commenced the defendants, despite their agreement, sought to challenge the validity of the plaintiff's patent. Most significantly, their agreement to accept validity had been incorporated into a judicial consent decree in the prior law suit. Upon examining the recent decisions of the Supreme Court, which the court found to be "strikingly unanimous in result as well as reasoning", the Court of Appeals determined that "the desirability of settling a lawsuit would not in itself establish sufficient justification for such an agreement". The court went on to observe that the policy considerations expressed in *Blonder-Tongue, Lear, Sears* and *Compco* compelled the conclusion that such an agreement to accept the validity of a patent was unenforceable. It should be observed that this ruling was not predicated on the theory that the agreement was somehow not supported by valid consideration. The reason for the holding of unenforceability was not an absence of consideration but was rather the federal policy requiring that "all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent". See Lear v. Adkins, 395 U.S. at 668, 89 S.Ct. at 1910.

In the light of these decisions, the issue becomes whether in this case there is present an overriding federal policy which would be frustrated if the settlement agreement involved here is enforced. The position advanced by the defendant Spiller is difficult to follow since it travels ambivalently and indiscriminately between contentions of patent invalidity and claims of non-infringement. In substance, however, the Spiller argument, fairly described, is that as to its use of the Ionic Model 25 Electrostatic Sprayer the settlement

agreement may not be enforced since to do so would frustrate the federal policy that "all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent". Lear v. Adkins, supra at 668, 89 S.Ct. at 1910. Specifically, Spiller submits that the concepts embodied in the Model 25 Electrostatic Sprayer, since they are predicated upon the prior art systems, "are in reality part of the public domain." Since these ideas fall within the public domain and because federal policy strongly favors free and full competition in the use of such ideas, their use by Spiller may not be subjected to the demand of patent royalty payments by Ransburg. Accordingly, I conclude that Spiller may properly defend this action on those grounds.

The second question is whether the defendant Spiller has under the facts carried the burden of its defense and is entitled to judgment as a matter of law. In this regard, Spiller argues that by reason of the Fourth Circuit decision in Ransburg Electro-Coating Corp. v. Ionic Electrostatic Corporation, 395 F.2d 92 (1968), Ransburg is estopped from challenging Spiller's claim that the settlement agreement improperly calls for the payment of patent royalties for the use of ideas which are in fact part of the public domain. In support of this position it relies on the Supreme Court's decision in Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788, which it argues permits a plea of estoppel in the circumstances of this case.

At issue in *Blonder-Tongue* was the validity of the judge-made doctrine of mutuality of estoppel, which found expression insofar as patent law was concerned in Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949. The doctrine proclaimed that unless both parties (or their privies) in a second law suit were bound by a judgment in a previous case, neither party (nor his privy) in the second action could use the prior judgment as determinative of an issue in the second action. Viewed narrowly, the holding in *Blonder-Tongue* could be restricted to the conclusion that *Triplett* "should be overruled to the extent it forecloses a plea of estoppel by one facing a charge of infringement of a patent that has once been declared invalid." Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313 at 350, 91 S.Ct. 1434 at 1453. The ruling in *Blonder-Tongue* is not so easily circumscribed, however, for even a casual examination of the reasoning and analysis employed by the Court leads inescapably to the conclusion that mutuality of estoppel has also been abandoned where the prior judicial finding was that the process or apparatus involved did not infringe upon the plaintiff's patent. The Supreme Court carefully and exhaustively examined the judicial developments regarding the doctrine of mutuality of estoppel and concluded that there was a clear tendency to depart from the rigid requirements of mutuality and an equally pronounced inclination to impose an estoppel against a party who has already litigated an issue once and lost. The court observed that "when these judicial developments are considered in the light of our consistent view—last presented in Lear, Inc. v. Adkins—that the holder of a patent should not be insulated from the assertion of defenses and thus allowed to exact royalties for the use of an idea that is not in fact patentable or *that is beyond the scope of the patent monopoly granted,* it is apparent that the uncritical acceptance of the principle of mutuality of estoppel expressed in Triplett v. Lowell is today out of place." 402 U.S. 313 at 349–350, 91 S.Ct. 1434 at 1453. [emphasis supplied]. It should be clear then that if indeed the Court of Appeals for the Fourth Circuit in Ransburg Electro-Coating Corp. v. Ionic Electrostatic Corp. held, as the defendant Spiller contends, that its use of the Ionic Model 25 was "beyond the scope of the patent monopoly granted", then Ransburg is bound here by that Court's determination unless it can show that it did not have a fair opportunity procedurally, substantively and evidentially to

pursue its claim in the Fourth Circuit.[3] See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313 at 333, 91 S.Ct. 1434, 28 L.Ed. 2d 788.

The Court of Appeals for the Fourth Circuit characterized the issue before it as whether Ransburg's patents and the injunction previously entered against their infringement encompassed the Ionic Model 25 Electrostatic Sprayers that are also involved in the case before me. After a painstaking and careful analysis of both the prior art and the Ionic Model 25 device, the court concluded that the Model 25 did not infringe upon any of Ransburg's patents. The basis of the court's ruling was that the paint spraying devices' dependence upon electrostatic forces to atomize the paint was so insubstantial and minimal that it did not exceed the employment of those forces in the prior art systems. 395 F.2d at 97. In other words, adopting the language of *Blonder-Tongue*, the Fourth Circuit Court of Appeals reached a final determination on the merits that the Model 25 paint spraying devices were "beyond the scope of the monopoly granted" by reason of Ransburg's patents. Therefore, since Spiller has raised the identical question in this litigation and since the decision of Court of Appeals for the Fourth Circuit constitutes a final judgment on the merits,[4] *Blonder-Tongue* entitles Spiller to the benefits of the earlier adjudication.

Under the overriding federal policy expressed in *Lear* and reaffirmed in *Blonder-Tongue* that "all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent", I find based on the foregoing facts that the 1965 settlement agreement between Ransburg and Spiller is unenforceable because it represents a demand for royalties for the use of an idea (i. e. the Model 25) which because it belongs to the prior art system is a part of the public domain.[5]

The remaining issue[6] as between Ransburg and Spiller is whether Spiller should be permitted to prevail on its counterclaim and thereby recover all sums previously paid pursuant to the settlement agreement. In this regard Spiller relies on a statement in *Lear* that the licensee would be permitted to avoid the payment of all royalties accruing after Adkins' 1960 patent issued if he could prove the patent was invalid. The context in which the statement was made, however, demonstrates that it was

---

3. No such lack of opportunity or disadvantage is claimed here by Ransburg.

4. Although Ransburg contends here that the Fourth Circuit decision is void for lack of jurisdiction, that Circuit has already rejected Ransburg's theory characterizing it as "insubstantial and frivolous". Ransburg Electro-Coating Corp. v. Ionic Electrostatic Corp. 431 F.2d 947, 949 (1970).

5. Although a portion of the sums generated by the settlement agreement is attributable to Spiller's improper use of a device known as the Ionic Model 50 Electrostatic Sprayer (see Ransburg Electro-Coating Corp. v. Procter Electric Company, 317 F.2d 302 (4th Cir. 1963)), I find that the entire agreement is unenforceable. In so ruling, I observe that there is no manageable procedure by which the portion of the agreement which is arguably lawful and enforceable can be severed from that portion of the agreement which is unenforceable. The agreement itself is silent regarding which of its terms could be allocated sole-

ly to Spiller's use of the Ionic Model 50. Moreover, neither of the parties before me have suggested any basis of allocation. Upon these considerations I judge that the entire settlement agreement must be voided.

6. The plaintiff Ransburg's argument that the defendant Spiller has waived the defenses predicated upon Lear v. Adkins, *supra*, because of Spiller's failure to raise these defenses in the 1965 litigation must likewise be rejected. Ransburg's reliance on Standard Industries, Inc. v. Tigrett Industries, Inc., 397 U.S. 586, 90 S.Ct. 1310, 25 L.Ed.2d 590 (1970) is misplaced. In *Standard Industries* the prior action which triggered the waiver of the defense constituted a ruling on the merits. In the case at bar, however, the 1965 litigation was dismissed without prejudice pursuant to F.R.Civ.Proc. 41(a) (1). Since that dismissal was without prejudice the defendant Spiller cannot now be barred from raising any defenses which he might have raised in the prior action.

not intended to create in a patent licensee the unfettered right to recover all royalties paid under a patent later declared invalid. The only thing decided in *Lear* was that a licensee in that situation would be relieved from the liability of paying royalties during the time he is challenging the validity of the patent. My reading of *Lear* on this point is buttressed by language appearing in the Supreme Court's opinion in Blonder-Tongue. There the court said *"Lear* permits an accused infringer to accept a license, pay royalties for a time, and cease paying when financially able to litigate validity, secure in the knowledge that invalidity may be urged when the patentee-licensor sues for unpaid royalties." Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 346, 91 S.Ct. 1434, 1451, 28 L.Ed.2d 788. I find no expression in either *Lear* or *Blonder-Tongue* which would create an independent cause of action in a licensee permitting the recovery of royalties paid on a patent which is subsequently held invalid. Therefore, with respect to its counterclaim, defendant Spiller's motion for summary judgment is denied and the counterclaim is ordered dismissed and judgment entered for Ransburg.

The only remaining issue before me is that presented by Spiller's third party action against the Ionic Electrostatic Corporation, the manufacturer of the paint spraying systems (i. e. the Model 25 and the Model 50) purchased by Spiller. It is the position of Spiller that Ionic is liable to it for the sums which it paid to Ransburg under the 1965 settlement agreement. Spiller's theory of Ionic's liability rests upon a claim of expressed and implied warranties that the equipment manufactured by Ionic did not infringe upon any of Ransburg's patents, and on the contention that Spiller is the third party beneficiary of an indemnification agreement between Ionic and a separate corporation known as the Ionic Midwest Corporation. With respect to the purported indemnification agreement Spiller alleges that Ionic agreed to indemnify the Ionic Midwest

Corporation, a distributor of Ionic's paint spray equipment, as well as the customers of Ionic Midwest, for any damages resulting from any patent infringement actions brought by Ransburg against these parties. Spiller's warranty arguments are to the same effect.

Ionic has responded to Spiller's contention with three affirmative defenses. It claims that the subject matter of the third party complaint is not ancillary to the claim raised in the principal complaint; that the court lacks *in personam* jurisdiction over the third party defendant; and that the third party complaint fails to state a claim upon which relief may be granted. Both Spiller and Ionic have filed motions for summary judgment supported by affidavits and exhibits.

On February 26, 1971 I rejected the first two of Ionic's affirmative defenses in denying its motion to dismiss the third party complaint. Therefore, I shall not reconsider those contentions at this time. However, I agree with Ionic that Spiller's third party complaint fails to state a claim upon which relief can be granted and I find therefore that judgment must be granted in favor of Ionic and against Spiller on its third party complaint.

In connection with this ruling I find that Spiller's entire argument, under both the warranty and indemnification agreement theories, is premised upon its characterization of the payments made under the 1965 settlement agreement to Ransburg as damages which are attributable to a patent infringement law suit. This supposition by Spiller completely ignores the argument advanced by it in connection with its own motion for summary judgment against Ransburg. There Spiller characterized the payments made as royalties paid pursuant to what in substance is a license agreement. It should be apparent that Spiller can not have it both ways. Since I agree with Spiller's earlier characterization of the payments as essentially royalties, Spiller can not prevail on its third party complaint. Nowhere in any of Spiller's arguments or

in any of the affidavits or exhibits submitted in connection therewith is the contention made that Ionic at any time agreed to reimburse Spiller for royalties paid to Ransburg pursuant to a license agreement. Absent a claim upon which relief can be granted, judgment will be entered in favor of Ionic on the third party complaint.

Summarizing, the motion of Ransburg Electro-Coating Corporation for summary judgment on the allegations in its complaint is denied. The motion of the defendants Spiller and Spiller, Inc. for summary judgment is granted in so far as it requests a determination that the 1965 settlement agreement is unenforceable. With respect to its counterclaim the motion for summary judgment of the defendant Spiller is denied and judgment entered in favor of Ransburg. Likewise, Spiller's motion for summary judgment on its third party complaint is denied and judgment is entered in favor of Ionic Electrostatic Corporation. All other motions still pending before me in this cause including Spiller's motion for sanctions against Ransburg are to the extent not granted herein expressly denied. Judgment shall enter accordingly.